# Exhibit A

# VAPORFI

# FRANCHISE AGREEMENT

# VAPORFI FRANCHISE AGREEMENT
## TABLE OF CONTENTS


| ITEM | TITLE | PAGE |
|---|---|---|
| | Recitals | 1 |
| I | License, Licensed Marks and Protected Territory | 1 |
| II | Term | 5 |
| III | Franchise and Royalty Fees | 6 |
| IV | **Shop** Site Selection and Construction | 7 |
| V | Training | 10 |
| VI | **Shop** Operation | 10 |
| VII | **Shop** Inspection | 15 |
| VIII | Suppliers | 15 |
| IX | Insurance | 17 |
| X | Indemnification | 18 |
| XI | Advertising and Related Fees | 18 |
| XII | Cooperatives | 21 |
| XIII | Payments | 22 |
| XIV | Reporting, Recordkeeping and Accounting | 23 |
| XV | Transfer | 24 |
| XVI | Proprietary Rights and Confidentiality | 30 |
| XVII | Non-Competition | 31 |
| XVIII | Relationship of the Parties | 33 |
| XIX | Default and Termination | 33 |
| XX | Post Termination | 37 |
| XXI | Notices | 38 |
| XXII | Miscellaneous | 39 |
| XXIII | No Projections or Representations | 43 |
| XXIV | Acknowledgments | 43 |


EXHIBITS


| | | |
|---|---|---|
| A | Location Designation | FA-A1 |
| A-1 | Location Approval Form | FA-A2 |
| B | Promissory Note and Guaranty | FA-B1 |
| C | Agreement with Landlord | FA-C1 |
| D | Employment - Non-Competition Agreement | FA-D1 |
| E | Business Entity Information | FA-E1 |
| F | Guaranty and Assumption of Obligations | FA-F1 |
| G | Confidentiality, Non-Disclosure and Non-Competition Agreement | FA-G1 |

**VAPORFI**
**FRANCHISE AGREEMENT**

THIS FRANCHISE AGREEMENT (the "Agreement") is made at Atlanta GA, ____________, as of the 9 day of September, 20 16 by and between **VAPORFI FRANCHISING, LLC**, a Delaware limited liability company (hereinafter called "Franchisor") and Monica Hinton & Walter Hinton (hereinafter, called "Franchisee").

**RECITALS**

Franchisee hereby acknowledges receipt of a **VAPORFI** Franchise Disclosure Document, including a copy of this Agreement, containing all of its material terms, which Franchisee received at the earlier of: 1) fourteen (14) days prior to the signing of this Franchise Agreement or any related agreement(s); or 2) fourteen (14) days before any payment by Franchisee to Franchisor.

This Agreement is concerned with the offer and sale of a franchise for the establishment and operation of a **VAPORFI** retail business (the "**Shop**") offering electronic cigarettes, e-liquids, nicotine; vaporizers and accessories and other related items, as presently designated by Franchisor and as may be improved, further developed, or otherwise modified by Franchisor from time to time.

The distinguishing characteristics of a **Shop** include, but are not limited to: the name "**VAPORFI**"; "know-how"; sales and merchandising methods; proprietary products; training; advertising techniques; signage; trade dress; architectural design; record keeping and business management methods, all of which may be changed from time to time by Franchisor (hereinafter collectively, the "System").

Franchisee is desirous of obtaining a franchise to operate a **Shop** utilizing the concepts, methods, and techniques all under the System, as such System may be constituted by Franchisor from time to time (the "Franchised Business"). Franchisee has submitted an application and other pertinent information, including financial statements, to Franchisor which fully and truthfully set forth the information therein and Franchisee has further advised Franchisor of all persons who will hold interests in the franchise.

Franchisee has read this Agreement and understands and accepts the terms, conditions, and covenants contained in this Agreement as being reasonably necessary to maintain Franchisor's standards of quality and service and the uniformity of those standards at all **Shops** in order to protect and preserve the Franchisor's trademarks and the goodwill associated therewith.

THEREFORE, Franchisor and Franchisee, intending to be legally bound, for and in consideration of the mutual covenants hereinafter following, do mutually covenant and agree:

## I. LICENSE, LICENSED MARKS, AND PROTECTED TERRITORY

A. License

Franchisor hereby grants Franchisee the right to use the service mark "**VAPORFI**" and

such other service marks, trademarks, trade names, and copyrights as Franchisor may designate from time to time, and Franchisee is hereby licensed to use the System for the operation a **Shop**. The operation of the **Shop** shall be conducted by Franchisee only at the approved location (hereinafter called, "Franchise Location"). If, at the time of execution of this Agreement, the Franchise Location is not designated as a specific address on Exhibit "A", then the Franchisee agrees to execute the **VAPORFI** Franchise Agreement - Location Approval Form, attached hereto as Exhibit "A-1" and by this reference, incorporated herein, in accordance with the provisions of Section IV, hereof and the street address of the Franchise Location shall be set forth in such Location Approval Form. Franchisee agrees not to change the location of the **Shop** without the prior written approval of Franchisor.

B. Licensed Marks

International Vapor Group, Inc., and VaporFi, Inc., affiliated entities, have licensed the Proprietary Marks to us to use in connection with the franchising, development and operation of **Shops**. Franchisee, in operating the **Shop**, shall use such service marks, trademarks, trade names, commercial symbols and logos (hereinafter, the "Proprietary Marks") as approved by Franchisor only in such manner as is specified from time to time by Franchisor. Franchisee will not use any variations or colorable imitations of the Proprietary Marks. Franchisee expressly acknowledges Franchisor's rights in and to the Proprietary Marks and agrees not to represent in any manner that Franchisee has acquired any ownership rights therein. Franchisee's right to use the Proprietary Marks is derived solely from this Agreement and is limited to the conduct of business by Franchisee pursuant to and in compliance with this Agreement. This Agreement confers no goodwill or other interest in the Proprietary Marks upon Franchisee, other than the right to use the Proprietary Marks in the operation of the **Shop** in compliance with this Agreement and all applicable standards, specifications and operating standards, specifications and procedures prescribed by Franchisor from time to time. Franchisee agrees not to contest Franchisor's title to the Proprietary Marks. Any goodwill established in the Proprietary Marks by reason of Franchisee's use of them shall inure solely to Franchisor's exclusive benefit and upon the expiration or termination of this Agreement for any reason, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the Proprietary Marks. Any unauthorized use of the Proprietary Marks by Franchisee shall constitute a breach of this Agreement. All provisions of this Agreement applicable to the Proprietary Marks as same shall exist on the date hereof, shall apply to any additional Proprietary Marks hereafter authorized for use by, and licensed to, Franchisee by Franchisor.

Federal trademark or service mark registrations for any or all of the Proprietary Marks may be sought and thereafter obtained. There can be no assurance that any such registrations will be granted. There may be similar trademarks or service marks, either registered or not registered, owned by third parties. Such third parties may have rights in such trademarks or service marks that are superior to Franchisor's rights in the Proprietary Marks, thereby restricting the ability of Franchisor to expand the System into certain geographic areas. Franchisor makes no representations concerning the possible rights of such third parties. Franchisee is advised to determine the status of the Proprietary Marks prior to entering into this Agreement.

Franchisee shall use the Proprietary Marks as the sole identification of the **Shop**, provided that Franchisee shall be identified as the independent owner of the **Shop** in the manner prescribed by Franchisor. Franchisee shall not use the Proprietary Marks as part of the name of any business entity or trade name or with any prefix, suffix or other modifying words, terms, designs or symbols (other than commercial logos licensed to Franchisee hereunder), or in any

modified form, nor may Franchisee use any Proprietary Marks in connection with the performance or sale of any unauthorized services or goods or in any other manner not expressly authorized in writing by Franchisor. Franchisee shall prominently display the Proprietary Marks on such signs, merchandise, stationery, business cards, uniforms and other articles as designated by Franchisor and only in accordance with Franchisor's instructions and shall display such notices of trade and service marks registrations as Franchisor specifies. Franchisee, at Franchisee's expense, shall obtain such fictitious or assumed name registrations as may be required under applicable law prior to opening the Franchised Business to the public.

Franchisor shall have the sole right to handle disputes with third parties concerning the System, including, without, limitation, the Proprietary Marks. In that regard:

1) If Franchisee receives notice, or is informed, of: (a) any claim, suit or demand against Franchisee on account of any alleged infringement, unfair competition or similar matter by reason of Franchisee's use of the System in accordance with this Agreement, including, without limitation, Franchisee's use of the Proprietary Marks; or (b) any claim by any person of any rights in all or any part of the System or in any Proprietary Mark, Franchisee shall promptly notify Franchisor in writing of such claim, suit or demand. Franchisee has no right to settle or compromise any such claim, suit or demand. Franchisor shall have sole discretion to take such action as it deems appropriate (which, except in the case of suit, may include taking no action) and the right to exclusively control any litigation, United States Patent and Trademark Office or other proceeding arising out of any such infringement, challenge or claim or otherwise relating to the System or any Proprietary Mark. Franchisee shall cooperate fully with Franchisor and execute such documents and perform such actions as may, in the judgment of Franchisor, be necessary, appropriate or advisable in the defense of such claims, suits or demands and to protect and maintain the interests of Franchisor in the System and/or in the Proprietary Marks which are the subject of challenge. Franchisor will indemnify Franchisee for all actual damages (other than loss of income) and out-of-pocket expenses incurred by Franchisee in connection with any claim made by any third party for infringement, unfair competition or similar matter arising out of Franchisee's use of the Proprietary Marks or the System; provided, however, the foregoing obligation of Franchisor to reimburse Franchisee exists only if Franchisee has used the name or mark which is the subject of the challenge in strict accordance with the provisions of this Agreement, the Confidential Manual (as hereinafter defined) and any other written procedures, requirements or instructions of Franchisor, has notified Franchisor of the challenge as set forth above, and has otherwise fully cooperated with Franchisor.

2) If Franchisee receives notice, or is informed, of any infringing or unauthorized use of the System, Franchisee shall within seven (7) days thereof, notify Franchisor in writing of such infringing use. Franchisor need not initiate suit against imitators or infringers, nor take any other action to enforce or protect the System.

If it becomes advisable at any time in Franchisor's sole discretion for Franchisor and/or Franchisee to modify or discontinue use of any Proprietary Mark, and/or use one or more additional or substitute trade or service marks, Franchisee agrees to comply with Franchisor's directions to modify or otherwise discontinue the use of such Proprietary Marks within the time specified in the notice thereof given to Franchisee by Franchisor. Franchisor shall not be obligated to compensate Franchisee for any costs incurred by Franchisee in connection with such modification or discontinuance.

Upon expiration or termination of this Agreement, Franchisor may, if Franchisee

does not do so, execute in Franchisee's name an abandonment of the use of all Proprietary Marks which have been registered as assumed or fictitious names by Franchisee.

C. Protected Territory

1) During the initial term (and any renewal) of this Agreement, and provided that Franchisee is not in default of this Agreement or any other agreement between Franchisor and Franchisee, Franchisor shall not own, operate, sell, grant, license or approve the transfer of a **VAPORFI** franchise within the geographic area outlined on the attachment to Exhibit "A" (the "Protected Territory"). No other protected area or territory is granted by Franchisor to Franchisee. Franchisee may serve customers regardless of their address, but may not solicit customers outside the Protected Territory if the area of solicitation is the protected territory of another **VAPORFI** franchisee.

2) Except as otherwise provided, Franchisor retains the right, in its sole discretion, within the above described Protected Territory, to: (a) operate and grant others the right to operate or franchise other business systems at such locations and on such conditions as the Franchisor deems appropriate; (b) distribute or license the manufacture or distribution of goods and products, regardless of whether or not such products are authorized for offer and sale at **Shops**, under the Proprietary Marks either licensed hereunder or otherwise held by Franchisor, through any means of distribution (e.g., wholesale, direct mail, grocery or convenience stores, other retail outlets, Internet, other alternate channels of distribution) not otherwise prohibited hereby, provided however that if Franchisor shall make sales through the Internet to customers in Franchisee's Protected Territory, Franchisor shall pay Franchisee a commission in the amounts and for the items sold, as specified in the Confidential Manual; and (c) purchase or acquire one or more independent or third party businesses similar to the Franchised Business located within the Protected Territory, and to convert and operate, or grant third parties the right to operate, these businesses as **Shops**, so long as Franchisor offers Franchisee the right of first refusal to purchase and operate such business according to Franchisor's then-current form of franchise agreement.

3) Franchisee acknowledges Franchisor's right and the right of Franchisor's affiliates to develop, operate and franchise similar or dissimilar systems, under trademarks, service marks and commercial symbols other than the Proprietary Marks, without offering them to Franchisee.

D. Non-Traditional Locations

Franchisor also reserves the right to sell any products or services under the Proprietary Marks at certain locations, including, without limitation, stadiums, convention centers, hospitals, recreation centers, train stations, airports, bus stations, military sites, shopping centers or malls, colleges, universities and other educational sites, whether these locations are within or outside the Protected Territory ("Non-Traditional Locations"), provided that Franchisor shall first offer such right to Franchisee in writing, identifying the location and terms and conditions of conducting business at any such Non-Traditional Location, if Franchisee is in compliance with all agreements between Franchisee and Franchisor and its Affiliates (including this Agreement) and Franchisor determines that Franchisee is otherwise qualified to own and/or operate the business to be conducted at the Non-Traditional Location. Franchisee shall have thirty (30) days from the date of Franchisor's offer to accept or reject such offer, provided that Franchisee's acceptance must include an agreement to purchase or assume any assets or agreements related to

the proposed Non-Traditional Location at the price paid by Franchisor or its Affiliates for the same, as well as Franchisee's agreement to sign such instruments and documents (including, at Franchisor's discretion, a franchise agreement) as Franchisor reasonably requires for such Non-Traditional Location. In the event that Franchisee fails to accept Franchisor's offer of any Non-Traditional Location within thirty (30) days of the receipt of Franchisor's offer, Franchisor may, at its option, on its own behalf, through its affiliate or authorize another entity or individual to open and operate or franchise the operation of such Non-Traditional Location and retain all revenues generated, without any obligation to Franchisee.

## II. TERM

### A. Initial Term

The initial term of this Agreement shall be for a period of ten (10) years, from the date of the execution of this Agreement ("Term"), unless any lease (which shall also include a sublease) for the Franchise Location, shall be for a shorter period of time, in which event, the initial term shall be equal to the term of the lease.

### B. Renewal Option - Renewal Fees

Franchisee shall have the option subject to Franchisor's consent to renew the Franchise Agreement for two (2) additional periods of five (5) years, or for such lesser periods as are available under the lease for the Franchise Location, if any. Renewal shall require that: 1) Franchisee not be in default or in violation of this Agreement or any other agreement with Franchisor; 2) Franchisee has received satisfactory inspection reports during the expiring term; 3) Franchisee gives Franchisor written notice of Franchisee's election to renew not less than six (6) months prior to the end of the term then in effect; and 4) no later than sixty (60) days prior to the end of the term then in effect, Franchisee has completed all steps necessary to effectively renew, which may include, but are not necessarily limited to: (a) execution of the form of Franchise Agreement and any ancillary agreements then customarily used by Franchisor in the grant or renewal of franchises for the operation of **Shops**, which Franchise Agreement may contain terms materially different from those in the expiring Franchise Agreement, including royalty rate, advertising fees, and non-competition provisions (with appropriate modifications to reflect the fact that the Franchise Agreement relates to the grant of a renewal franchise); (b) Franchisee executing a general release(s), in form satisfactory to Franchisor, of any and all claims against Franchisor and its officers, directors, employees, and agents; (c) Franchisee making such capital improvements necessary to meet Franchisor's then existing criteria and standards for **Shops** and complying with Franchisor's then current training requirements; and (d) Franchisee paying a renewal fee equal to the lesser of 10% of the then current initial franchise fee or Five Thousand Dollars ($5,000). If Franchisee does not comply with the conditions for renewal to the reasonable satisfaction of Franchisor, Franchisee agrees that Franchisor shall have good cause to refuse to renew the Franchise Agreement. Notwithstanding Franchisee satisfying said conditions, renewal is at the discretion and approval of Franchisor. Failure or refusal by Franchisee to execute any agreements, instruments and documents required by Franchisor in connection with such renewal within a reasonable time after delivery to Franchisee, shall be deemed an election by Franchisee not to renew the franchise. If local law modifies, alters or amends all or part of the renewal provisions, then such provisions shall be modified, altered or amended accordingly, so as to be in full compliance with such local law.

Franchisee's right to renew the franchise is subject to Franchisee's ability to continue to

occupy the Franchise Location, or relocating the **Shop** to a mutually acceptable new location, within thirty (30) days after the expiration or termination of the right to occupy the current Franchise Location.

## III. FRANCHISE AND ROYALTY FEES

A. Initial Franchisee Fee

In consideration of the grant of the franchise by the Franchisor, the Franchisee agrees to pay an Initial Franchise Fee upon execution of this Agreement, in the amount of $29,900. Franchisee may either pay the full Initial Franchise Fee at the time Franchisee executes this Agreement, or make a payment of $14,950 at that time and sign a promissory note for $14,950, bearing interest at 10% per annum for a term of 24 months. Payments of $689.71 will be due on the 1st day of each month. The form of the promissory note and personal guaranty thereof (to be executed if Franchisee is a business entity) is attached to this Agreement as Exhibit "B".

The Initial Franchise Fee is fully earned by the Franchisor upon the execution of this Agreement and is non-refundable. In the event Franchisee does not submit an acceptable site for the Franchise Location within ninety (90) days after execution of this Agreement, this Agreement may be deemed canceled. In such event, Franchisor shall have no obligation to refund any portion of the Initial Franchise Fee previously paid.

B. Royalty Fee

During the term of this Agreement, Franchisee shall pay to Franchisor by the 10th day of each month during the Term for the preceding month, a royalty fee ("Royalty Fee") in an amount equal to the greater of $425 (the "Minimum Royalty") or 3% of all Revenues.

C. Revenues

The term "Revenues", as used in this Agreement, shall mean the aggregate gross amount of all revenues from whatever source derived (whether in the form of cash, credit, agreements to pay or other consideration, and whether or not payment is received at the time of sale or any such amounts prove uncollectable) which arise from or are derived by Franchisee or by any other person from business conducted or which originated in, on, from, or through the Franchise Location, or from the sale of any products associated with the use of the Proprietary Marks, whether such business is conducted in compliance with or in violation of the terms of this Agreement, excluding only sales or other tax receipts (the collection of which is required by law and promotions, deductions (e.g. coupons, buy-one get-one-free) and allowances).

All payments by Franchisee shall be applied in such order as Franchisor may designate from time to time. Franchisee agrees that Franchisee may not designate an order for application of any fees different from that designated by Franchisor and expressly acknowledges and agrees that Franchisor may accept fees paid pursuant to different instructions without any obligation to follow such instructions, even if such payment is made by its terms conditional on such instructions being followed. This provision may be waived only by written agreement signed by Franchisor, which written agreement must be separate from the check or other document constituting payment.

D. Cost of Living Adjustment

The amount of the Minimum Royalty shall be adjusted on April 1, of each year in the following manner: The Minimum Royalty payable each month during the preceding twelve (12) months (initially $425) shall be multiplied by a fraction, the numerator of which shall be the CPI for the prior calendar year (the "Prior Year") and the denominator of which will be the CPI for the year immediately preceding the Prior Year. For purposes of this calculation, "CPI" means the Consumer Price Index published by the Bureau of Labor Statistics of the U.S. Department of Labor, for All Urban Wage Earners and Clerical Workers, U.S. Cities (1982-84 = 100), "All Items". The new Minimum Royalty shall take effect as of June 1 of each year.

## IV. SHOP SITE SELECTION AND CONSTRUCTION

A. Locating the Site

In the event the site for the Franchise Location has not been approved by the Franchisor upon execution of this Agreement and entered on Exhibit "A" hereto, it shall be the sole obligation of the Franchisee to locate a site suitable for the operation of the **Shop** within thirty (30) days after execution of this Agreement. Franchisor may require that you use and pay the then current fee for Franchisor's approved provider of real estate site selection services. The site must meet Franchisor's criteria for demographic characteristics, traffic patterns, parking, character of neighborhood, competition from and proximity to other businesses and other **Shops**, the nature of other businesses in proximity to the site, other commercial characteristics and the size, appearance and other physical characteristics of the proposed site. The proposed site must be approved by the Franchisor prior to Franchisee executing a binding lease or otherwise securing the proposed site. Franchisor will approve or disapprove a proposed site for the **Shop** within forty-five (45) days after Franchisor receives from Franchisee, a complete site report and any other materials Franchisor requests. Franchisor's approval of a site or Franchisee's use of Franchisor's approved provider of real estate services does not constitute a representation or warranty that the Franchise Location will be profitable or that the Franchisee's revenues will attain any predetermined levels. Such approval is intended only to indicate that the proposed site meets the Franchisor's minimum criteria for identifying sites. The Franchisee agrees that the Franchisor's approval or disapproval of a proposed site shall not impose any liability or obligation on the Franchisor. In the event Franchisee does not submit an acceptable site within the aforesaid ninety (90) day period, Franchisor may terminate this Agreement.

Relocation

Franchisee may only operate the **Shop** at the location designated in Exhibit "A" hereto, and approved by Franchisor, and Franchisee may not move Franchisee's operation, except upon Franchisor's written consent, subject to any rights granted to other franchisees. Franchisor's approval, if given, will be based on a variety of factors including loss of location; reason for closure; or objective confirmation that original site selected by Franchisee was based on error. Any relocation will be at Franchisee's sole cost and expense and must be accomplished within **sixty** (60) days after Franchisor's written approval for the relocation is given.

B. Lease of **Shop** Site

Franchisee shall execute a lease (the "Lease") for the **Shop** with the landlord of the **Shop** the terms of which are subject to Franchisor's approval within fifteen (15) days after Franchisor

gives written approval for the site. The Lease must contain, as an addendum, the Agreement with Landlord, which is Exhibit "C" to this Agreement

C. Franchisor Acceptance

Franchisee shall not execute the Lease or, if Franchisee intends to purchase the **Shop** site, enter into any binding obligation with respect to the purchase of the **Shop** site, until: (i) the **Shop** site has been accepted in writing by Franchisor; and (ii) the terms and conditions of the Lease or the purchase documents have been approved in writing by Franchisor, which approval shall not be unreasonably withheld. In the event Franchisee requests Franchisor to assist in the negotiation of any such Lease or the purchase of the **Shop** site, Franchisee shall pay Franchisor as a negotiation fee, the sum of $500 per day (based on an 8-hour day, including travel time), plus all expenses of Franchisor for travel, lodging, meals and other out-of-pocket expenses incurred in connection therewith.

D. Site Plans

Franchisor will provide Franchisee with a **Shop** design package, including a sample layout for the interior and exterior of a typical **Shop**, and with a set of typical preliminary plans and furniture, fixtures and decor specifications. Franchisee shall, at Franchisee's sole expense, employ architects, designers, engineers, contractors and others as may be necessary to complete, adapt, modify or substitute the sample plans and specifications for the **Shop** site. Franchisee shall submit to Franchisor a complete set of final plans and specifications and the name of the general contractor prior to commencing construction of the **Shop** site and shall not commence construction of the **Shop** site until Franchisor approves same in writing. It shall be and remain the sole responsibility of Franchisee to diligently design, construct, equip and otherwise ready and open the **Shop** site.

E. Construction

Franchisee shall use a licensed, bondable general contractor to perform construction work at the **Shop** site. Franchisor shall not be responsible for delays in the construction, fixturing or decoration of the **Shop** or for any loss or damage to Franchisee or any third party resulting from the design or construction of the **Shop**. Franchisee must obtain Franchisor's prior written approval of any and all changes in the **Shop** plans and specifications prior to modification for local conditions and requirements and construction of such **Shop** or the implementation of such changes. Franchisor shall have access to the **Shop** while work is in progress and may require such reasonable alterations or modification of the construction of the **Shop** as it deems necessary. The **Shop** will not be allowed to open if it does not conform to the plans and specifications approved by Franchisor, including any changes to such plans and specifications accepted by Franchisor. All approvals/acceptances by Franchisor shall be in writing, on such forms as Franchisor designates. Franchisee shall provide Franchisor with a minimum of fifteen (15) days advance notice of Franchisee's opening date.

F. Improvements

At Franchisee's sole expense, Franchisee must install all required signs, fixtures, furniture and décor items for the **Shop** site pursuant to the specifications and criteria specified in this Agreement or the Confidential Manual. It shall be the Franchisee's sole responsibility to purchase any and all signs, fixtures, furniture, and décor items from suppliers approved and/or

designated by Franchisor and to inspect any such materials used in connection with the **Shop** site to ensure that such materials conform with Franchisor's specifications and are safe for use in connection with a **Shop**.

G. Modification

No modifications or alterations to the completed **Shop** shall be made by Franchisee without the prior written permission of Franchisor. Franchisee agrees to make all modifications and renovations reasonably requested by Franchisor, within the time period specified by Franchisor.

H. NO WARRANTY

FRANCHISEE AGREES THAT FRANCHISOR MAKES NO WARRANTIES, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO ANY OF THE SIGNS, FIXTURES, FURNISHINGS, DECOR, PRODUCTS, SUPPLIES AND MATERIALS USED IN CONNECTION WITH THE **SHOP** SITE (COLLECTIVELY REFERRED TO AS THE "MATERIALS"), NOR THE AMOUNT WHICH FRANCHISEE MAY BE REQUIRED TO EXPEND TO ACQUIRE SUCH MATERIALS. FRANCHISOR MAKES NO WARRANTY OF MERCHANTABILITY OF THE MATERIALS, NOR OF THE FITNESS OF THE MATERIALS FOR ANY PARTICULAR PURPOSE. ORAL STATEMENTS MADE BY FRANCHISOR'S EMPLOYEES OR AGENTS, OR STATEMENTS CONTAINED IN THE CONFIDENTIAL MANUAL OR PRINTED MATERIAL OR ANY MANUFACTURER'S GENERAL ADVERTISING OR PRINTED MATERIAL, DO NOT CONSTITUTE WARRANTIES AND FRANCHISEE AGREES THAT FRANCHISEE DOES NOT PLACE AN ORDER FOR ANY MATERIALS IN RELIANCE UPON THEM.

FRANCHISOR SHALL NOT BE LIABLE FOR ANY DAMAGES, INCLUDING WITHOUT LIMITATION, ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, WHICH MAY ARISE IN CONNECTION WITH THE SALE OR USE OF THE MATERIALS, WHETHER WITH RESPECT TO CLAIMS OF BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE OR OTHER CLAIMS. IN PARTICULAR, FRANCHISOR SHALL NOT BE LIABLE FOR LOSS OF SALES, REVENUES AND/OR PROFITS AND/OR CLAIMS OF ANY THIRD PARTIES.

I. **Shop** Opening

Franchisee agrees that the **Shop** shall be completed and open for business no later than one thirty-five (135) days from the date Franchisee secures the site for the Franchised Business (hereinafter referred to as the "Specified Opening Date"), unless delayed by causes beyond the reasonable control of Franchisee. In the event Franchisee is not open for business to the public on the Specified Opening Date, Franchisor shall be entitled to receive from Franchisee, in lieu of the Royalty Fee Franchisor would have received, an amount equal to Five Hundred Dollars ($500) per month, during the period which Franchisee is not open for business. Franchisor may also terminate this Agreement upon ten (10) days prior written notice, if the **Shop** is not open for business by the Specified Opening Date. Upon such a termination of this Agreement, Franchisor shall be entitled to retain as liquidated damages and not as a penalty, all amounts Franchisee has previously paid to Franchisor, including but not limited to the Initial Franchise Fee, and Franchisor may pursue such other remedies as are available to it at law and in equity. The Specified Opening Date shall be extended for the number of days during which the opening is

delayed for causes beyond Franchisee's reasonable control.

J. Single Purpose

The Franchise Location shall be used for no purpose other than the operation of a **Shop**, unless otherwise agreed to in writing by Franchisor.

## V. TRAINING

Franchisor shall provide, and all owners of the Franchised Business, and Franchisee's manager shall attend, the initial training program. In addition, other of Franchisee's employees may attend such training. If you have successfully completed the initial training, you may train your manager. However, no more than four (4) persons may attend the initial training without payment of the then current tuition charge. The initial training will be conducted at such place(s) as designated by Franchisor, following execution of this Agreement and prior to the **Shop** opening for business. Franchisee shall be responsible for all travel, lodging, and subsistence expenses of those persons attending the training session. Franchisor's training program will include both classroom and on-the-job training in all phases of the operation of a **Shop**. Prior to the **Shop** opening for business to the public and for a period thereafter, Franchisor will provide an on-site supervisor, at no additional cost to Franchisee. The maximum period during which such supervisor shall be on-site shall be five (5) days.

Franchisee acknowledges that it is of paramount importance that Franchisee understands the System and therefore, failure to complete Franchisor's initial training program to the satisfaction of Franchisor, shall be grounds for Franchisor to elect to terminate this Agreement.

Franchisor may require Franchisee and/or previously trained personnel to attend periodic refresher courses at locations designated by Franchisor at no charge. Franchisee shall be responsible for all travel, lodging and living expenses that Franchisee and each such person incur in connection with any subsequent training program.

Franchisee has the right to request additional training from time to time and Franchisor shall, at its sole discretion, provide such training to Franchisee or to Franchisee's personnel at such times and places and for such duration as Franchisor deems necessary; provided, that Franchisee pays the then current cost of such additional training, including the cost of transportation, subsistence, lodging, and the current charge for the services of Franchisor's representative(s), which costs shall be paid in advance.

Franchisee specifically agrees that only owners of the Franchised Business or designated managers, who have been trained by Franchisor, shall have overall responsibility for the day-to-day operation of the **Shop** and that at Franchisee's sole cost and expense, which includes a tuition charge, each such person shall attend such training, unless such training is waived by Franchisor.

## VI. SHOP OPERATION

In order to maintain uniform standards of operation for all **Shops** and to protect the goodwill of Franchisor, it is agreed as follows:

A. Standards

Franchisee acknowledges that each and every detail of the appearance, layout, decor, materials, and supplies utilized, services offered, and operation of the **Shop** is important to Franchisor and other **VAPORFI** franchisees. Franchisee shall maintain the high standard of quality as determined by Franchisor with respect to the System and the operation of the Franchised Business pursuant to the System. Franchisee shall comply with all mandatory specifications, standards and operating procedures relating to: 1) layout, decor, and color scheme of the **Shop**; 2) exterior design and materials; 3) appearance of employees and uniform specifications; 4) appearance, cleanliness, sanitation, standards of services, and operation of the **Shop**; 5) fixtures, furnishings, materials, supplies and suppliers; 6) hours and days during with the **Shop** will be open for business; and 7) customer service, as specified in the Confidential Operating Manual (hereinafter called "Confidential Manual"). Mandatory specifications, standards, and operating procedures may be prescribed from time to time by Franchisor in the Confidential Manual, or otherwise communicated to Franchisee in writing or via electronic means. All references herein, to this Agreement, shall include all such mandatory specifications, standards, and operating procedures.

B. Confidential Manual

The requirements of the Confidential Manual (which may be in one (1) or more volumes or in electronic form), and which shall be loaned to Franchisee by Franchisor during the initial term and any renewal of this Agreement) shall govern the operation of the **Shop**. Changes in such requirements may be made by Franchisor from time to time as deemed advisable by Franchisor. Franchisee will operate the **Shop** in accordance with the standards, specifications, and procedures set forth in the Confidential Manual, will comply with any changes in such standards, specifications, and procedures as may become necessary and desirable from time to time, and will accept as reasonable any modifications, revisions, and additions to the Confidential Manual which Franchisor, in the good faith exercise of its judgment, believes to be necessary and desirable. If Franchisee should lose the Confidential Manual or any part thereof or request a replacement for any reason, Franchisee shall pay $250 as a replacement fee before Franchisor will provide the replacement.

C. Maintenance of Exterior and Interior Decor

Franchisee shall at all times maintain the interior and exterior of the **Shop** and the surrounding area in the highest degree of cleanliness, orderliness, and sanitation, and shall also comply with the requirements of the Confidential Manual regarding the upkeep and decor of the **Shop**. Franchisee shall immediately comply with all orders and regulations of applicable state and local health and safety administrators. Franchisee shall repair, refinish, or paint the exterior and the interior of the **Shop** at Franchisee's own expense at such times as reasonably directed by Franchisor or as required by any Lease.

D. Upkeep of **Shop**

Maintenance and repair of the **Shop** is the sole responsibility of Franchisee. Franchisee shall maintain the signs, decor, furnishings, fixtures, and all other tangible property in the **Shop** in excellent condition and repair and shall replace any of the furnishings, fixtures and decor which become obsolete or impaired so same no longer adequately perform the functions for which they were originally intended. Replacements shall be of the same type and quality as are

being used in new **Shops** at the time replacement is required and shall comply with Franchisor's requirements and specifications. Remodeling of the **Shop** (including signage), to conform to the current **VAPORFI** format and style, shall be undertaken five (5) years from the commencement of the term, at the time of renewal of this Agreement, at such time(s) as is required under the terms of any Lease, or otherwise, at Franchisor's discretion.

In addition to the foregoing, in order to introduce new products or services through all **Shops**, Franchisee may be required to spend additional amounts on new, different or modified equipment or fixtures necessary for Franchisee to offer such new products or services.

In the event the Franchise Location is, at any time, to be altered or remodeled, or additional decorations, fixtures, furniture, or equipment are to be installed or substituted, or signs are to be erected or altered, all of such work shall be subject to the prior written approval of Franchisor, and, when completed, shall conform to plans and specifications approved by Franchisor. Franchisor may inspect, but shall not be obligated to inspect, such work at any time to determine that the work is done in accordance with Franchisor's approved plans and specifications.

E. Hours of Operation

Franchisee shall continuously operate the **Shop** for the hours and days of the week as specified in the Confidential Manual, unless different hours have been approved in writing by Franchisor, based upon the circumstances existing with the Franchise Location.

F. Supervision

The owner(s) or manager(s) of the Franchised Business shall devote full time and attendance, as well as his/her best efforts, to the performance of supervisory and day-to-day **Shop** operational duties. The **Shop** shall be managed only by an owner(s) or a manager(s), who has been trained to the satisfaction of and approved by Franchisor in the methods and procedures of the System, who shall be physically present at the **Shop** during operating hours.

G. **Shop** Personnel

All personnel employed by Franchisee at the **Shop**, shall maintain such standards of decorum and demeanor as shall be established by Franchisor. All personnel performing managerial or supervisory functions, all personnel receiving special training and instruction, and all persons employed by Franchisee having access to any of Franchisor's Confidential Information (as herein defined), shall execute the Employment-Noncompetition Agreement (Exhibit "D", hereto). Franchisee shall, at its sole expense, enforce such Agreement, when and if so directed by Franchisor.

H. Computer System

Franchisee shall purchase and install at Franchisee's expense at the Franchise Location, such computer hardware, point-of-sale, software, required dedicated telephone and power lines, modem(s), printer(s) and other computer-related accessory and peripheral equipment or combinations or integrated systems ("Computer System") as meets Franchisor's standards and specifications, as specified in the Confidential Manual or otherwise in writing. The computer hardware pre-loaded with Franchisor's software must be purchased from Franchisor. Franchisee

will be required now or in the future to provide such assistance and purchase such equipment required by Franchisor to bring such computer system and the **Shop** "on-line" with Franchisor's Computer System. Franchisee acknowledges and agrees that Franchisor will have the free and unfettered right to retrieve such data and information directly from Franchisee's Computer System as Franchisor shall deem necessary, desirable or appropriate. The telephonic or other transmission costs of such retrieval will be borne by Franchisee. Franchisor may charge Franchisee a reasonable fee for modifications made to any proprietary software and for other forms of maintenance and support that Franchisor requires. Franchisee must use only Franchisor's approved software, as same is initially supplied by Franchisor and specified in the Confidential Manual. Franchisee agrees to purchase and install any new or upgraded software programs, manuals and computer-related materials and equipment whenever Franchisor determines to adopt such new or upgraded programs, manuals and computer-related materials and equipment for all **VAPORFI** franchisees. Franchisee understands and agrees that computer designs and functions change periodically and that Franchisee may be required to make and install substantial modifications to the Computer System, and make additions, changes and modifications during the term of this Agreement to ensure full operational efficiency and communications capability.

I. Franchisor's Employees

Franchisee shall not interfere with the employees and agents of Franchisor in the performance of such employees' and agents' duties, and Franchisee further agrees that Franchisee will not employ or seek to employ any of Franchisor's employees or agents, or any employees or agents of Franchisor's parent or affiliate(s) or any employees or agents of other franchisees of Franchisor, for a period of at least two (2) years following the separation of any such employee from employment by Franchisor or its parent or affiliate(s), or other franchisee or the termination of any agency relationship with Franchisor, its parent, or affiliate(s), or other franchisee without the prior written consent of the Franchisor, its parent, affiliate, or such other franchisee, which shall if given, be done so on Franchisor's form document.

J. Franchisee's Cooperation

Franchisee shall cooperate with Franchisor in taking any action, or refraining from taking any action which, in the judgment of Franchisor, is necessary or desirable to promote and enhance the quality of the service provided by the **Shop**, or the image of the **Shop** in the local community. Franchisee shall attend all **VAPORFI** franchise meetings as Franchisor deems mandatory from time to time and as Franchisor deems in the best interest of the System as a whole, including the annual convention. The cost of attending these meetings shall be that of Franchisee, including the cost of transportation, subsistence, lodging, and a tuition or attendance fee, if imposed by Franchisor.

K. Compliance with Laws and Procedures

1) Franchisee shall operate the **Shop** in strict compliance with all applicable laws, rules, and regulations of duly constituted governmental authorities, including, without limitation, obtaining and maintaining all required permits and licenses, all applicable labor and employment laws and regulations, data privacy laws, payment of all taxes, and in strict compliance with the standard procedures established by Franchisor from time to time including, without limitation, accounting records and information, on such forms as Franchisor may require; payment procedures; hours of operation; standards of sanitation, maintenance, and repair; cleaning and fire prevention service; and all matters that, in Franchisor's judgment,

require standardization and uniformity in all **Shop**. All costs that may be incurred in order to maintain and implement such standard procedures shall borne by Franchisee, at Franchisee's sole expense. Franchisee shall also provide to Franchisor, upon request, copies of all reports filed by Franchisee with any federal, state or local governmental agencies.

2) Franchisee and its owners agree to comply, and to assist Franchisor, to the fullest extent possible, in Franchisor's efforts to comply with Anti-Terrorism Laws (defined below). In connection therewith, Franchisee and its owners certify, represent, and warrant that none of their property or interests is subject to being blocked under, and that Franchisee and its owners otherwise are not in violation of, any of the Anti-Terrorism Laws. "Anti-Terrorism Laws" means Executive Order 13224, issued by the President of the United States, the USA PATRIOT Act, the U.S. Bank Secrecy Act, 31, U.S.C. Sec. 5318 et seq., the Regulations promulgated by the U.S. Treasury, Office of Foreign Asset Control, the Florida Money Transmitters Code, Ch. 560 F.S. and the Regulations promulgated thereunder, at 3C-560, Fl. Admin. Code and all other present and future federal, state, and local laws, ordinances, regulations, policies, lists, and other requirements of any governmental authority addressing or in any way relating to terrorist acts and acts of war. Any violation of the Anti-Terrorism Laws by Franchisee or its owners, or any blocking of Franchisee's or its owners' assets under the Anti-Terrorism Laws, shall constitute good cause for immediate termination of this Agreement.

L. Uniforms and Attire

Franchisor shall be entitled to prescribe standard uniforms, attire and dress code for all **Shop** personnel.

M. Good Business Practices

All marketing and promotion by Franchisee shall be subject to Franchisor's approval. Franchisee shall in all dealings with its customers, suppliers, Franchisor and the public, adhere to the highest standards of honesty, integrity, fair dealing, and ethical conduct. Franchisee agrees to refrain from any business or advertising practice which, in the opinion of Franchisor, may be injurious to the business of Franchisor and the goodwill associated with the Proprietary Marks and other **Shops**. Franchisee shall render prompt, willing and courteous service to all customers and adhere to Franchisor's customer service procedures, including reimbursement, as set forth in the Confidential Manual for customer's goods that are lost, damaged or destroyed.

N. Receipt of Notice

Within seven (7) days of the receipt by Franchisee of any report from any governmental or regulatory agency, Franchisee shall mail a complete copy of such report to Franchisor. Franchisee shall also mail to Franchisor, a copy of Franchisee's response and within five (5) days of receipt, a complete copy of all regulatory agency replies associated with the foregoing. Within seven (7) days of the receipt by Franchisee of any claim or demand for payment which could have a material effect upon the operations of the **Shop** by any third party based upon an alleged injury suffered at the **Shop** or upon other grounds, whether such claim is in writing and whether such claimant is a customer, Franchisee shall notify Franchisor in writing and, if such claim is in writing, shall deliver a complete copy of such claim to Franchisor. Franchisee shall notify Franchisor in writing within five (5) days of the commencement of any action, suit or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency, or other governmental instrumentality, which may adversely affect the operations or

financial condition of Franchisee or the **Shop** or of any notice of violation of any law, ordinance, or regulation relating to health or sanitation.

O. Destruction or Damage

If a cause destroys or damages the **Shop**, so that the **Shop** cannot continue to operate, Franchisee shall repair and restore the **Shop** to Franchisor's then existing specifications, subject to the applicable provisions of any Lease. The **Shop**, or if necessary, a **Shop** at an approved substitute location, shall be open and operating no later than six (6) months from the date of the destruction or damage.

P. Suggested Prices

From time to time, Franchisor may advise Franchisee as to suggested prices for products to be offered by Franchisee at the **Shop**. Franchisor and Franchisee agree that any such advice on pricing furnished to Franchisee by Franchisor is by way of recommendation only, and is not to be construed as binding or mandatory upon Franchisee, except that Franchisor may, in and at its discretion, establish a maximum and/or minimum price for any product(s) and if Franchisor so establishes a maximum and/or minimum price, Franchisee shall be obligated to conform its pricing for same thereto, to the extent permitted by law.

Q. Customer Relations

Franchisee shall respond promptly to customer complaints and shall take such other steps as may be required to insure positive customer relations. Franchisee acknowledges that exemplary customer relations are of paramount importance to the System and therefore, Franchisee shall use Franchisee's best efforts to consistently exceed customer expectations, by providing a superior level of quality, service, value, dedication and undivided attention. In the operation and maintenance of the Franchised Business, it shall be Franchisee's mission to attract and hold customers in order to become the first choice of prospective customers by consistently exceeding their expectations. Franchisee will follow Franchisor's policy on damage claims to customers' property, as set out in the Confidential Manual.

## VII. SHOP INSPECTION

Franchisor may inspect the **Shop** from time to time to determine compliance with uniformity and quality control. Franchisor's personnel or designated agent(s) shall have the right to enter the **Shop** at any reasonable time and from time to time for the purpose of examining, conferring with Franchisee or Franchisee's employees, inspecting the **Shop**, auditing, and all other purposes in connection with the determination that the **Shop** is being operated in accordance with the terms of this Agreement, the Confidential Manual, and other applicable rules. Franchisee agrees to remedy any defects, deficiencies, or unsatisfactory conditions discovered at the **Shop** by Franchisor's personnel, no later than forty-eight (48) hours after being advised of same in writing.

## VIII. SUPPLIERS

A. Products and Supplies

Franchisee shall cause the **Shop** to conform to Franchisor's specifications and quality

standards as specified in the Confidential Manual, and shall purchase only from distributors and suppliers approved by Franchisor, fixtures, furniture, décor items, supplies inventory, software, products, services and other items necessary to commence and continue operations. In order to maintain the reputation and goodwill of the Proprietary Marks of the **VAPORFI** System, and to maintain the quality and consistency of products offered and sold at **VAPORFI Shops,** Franchisor may, in its sole discretion, require that certain items be purchased exclusively from Franchisor (for example, inventory of electronic cigarettes, e-liquids, nicotine, vaporizers, accessories and related items, computer system) or from approved suppliers or distributors (for example furniture, fixtures and signage). We may make a profit on these sales. Franchisee acknowledges that during the Term, Franchisor may introduce new, improved, ancillary or other products and/or services to the System, and that Franchisee shall bear and pay the cost associated with same, if any. In approving distributors and suppliers for the **Shop**, Franchisor may consider such factors as quality of delivery service, inventory capability, financial condition, price and the reliability of the distributor or supplier. Franchisor may arrange for the concentration of purchases with one or more distributors or suppliers to obtain competitive prices. Approval of a distributor or supplier may be conditioned on requirements relating to the frequency of delivery, standards of service, including prompt attention to complaints, and concentration of purchases, and may be temporary, pending a further evaluation of the distributor or supplier by Franchisor, and may be changed from time to time. Franchisor reserves the right at its discretion to develop proprietary items, and to designate itself as the sole or as an approved supplier and to make a profit from the sale of such items to Franchisee. Franchisee shall not offer for sale or provide through the **Shop** any products or services that Franchisor has not approved. If Franchisor arranges for, or establishes, a cooperative buying program, Franchisee will be encouraged, but not obligated to participate.

Franchisor may from time to time require Franchisee to discontinue the use or sale of any product or item, or disapprove a previously approved distributor or supplier which or who in Franchisor's opinion does not meet the standards of quality established by Franchisor.

Franchisee will offer all products and services that Franchisor specifies, and only those products and services that Franchisor specifies. A description of currently authorized products and services is set out in the Confidential Manual. Franchisee acknowledges that Franchisor may receive revenue from approved or designated suppliers and that Franchisor shall have the right to retain all revenue received from approved or designated suppliers, except as prohibited by law. ALTHOUGH APPROVED BY FRANCHISOR, FRANCHISOR AND FRANCHISOR'S AFFILIATES MAKE NO WARRANTY AND EXPRESSLY DISCLAIM ALL WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE, WITH RESPECT TO PRODUCTS (INCLUDING WITHOUT LIMITATION AND ANY REQUIRED COMPUTER SYSTEMS), SUPPLIES, FIXTURES, FURNISHINGS OR OTHER APPROVED ITEMS. Franchisee shall not install, or permit to be installed, any pay telephones, newspaper racks, gum or candy machines, electronic or video games, electronic or mechanical machines, rides or similar items at or on the Franchise Location, unless approved in writing, in advance, by Franchisor.

B. Supplier Approval

If Franchisee, during the Term, desires to purchase items or services for use in the **Shop** from a supplier who has not been previously approved by Franchisor, Franchisee may request in writing approval by Franchisor of such supplier. Franchisor shall approve such proposed supplier if in Franchisor's sole judgment and discretion, Franchisor is satisfied that the supplier can meet

and maintain Franchisor's specifications, standards and requirements. Franchisee, in making such request, shall furnish Franchisor, at Franchisee's cost, with adequate samples of the items for which approval is being requested, or if that is not feasible, then with copies of descriptions, specifications and pictures of such items. Franchisee shall not sell, dispense or use any such items until such approval has been granted and notice thereof given to Franchisee in writing. Nothing contained herein shall be construed to require Franchisor to approve an unreasonable number of suppliers for any particular item or service which could interfere with the effective and economical supervision of suppliers by Franchisor. Franchisor reserves the right, as a condition precedent to approving or disapproving any request for a new or additional supplier of any item or service, to charge such proposed supplier the reasonable cost and expenses incurred by Franchisor in evaluating, investigating and determining any such request. Nothing contained in this Agreement shall be construed as an attempt by Franchisor to limit the sources from which Franchisee may procure equipment, supplies, products, or other items.

Franchisor may require Franchisee to discontinue the use or sale of any item or service obtained from a supplier recommended initially by Franchisee which, in Franchisor's opinion, does not continue to conform to the image or quality standards of Franchisor.

C. Trade Accounts

Franchisee agrees to maintain its trade accounts in a current status and to seek to resolve any disputes with trade suppliers promptly.

## IX. INSURANCE

A. Policies

Franchisee must purchase and at all times during the term of this Agreement shall maintain in full force and effect, policies of insurance designated by Franchisor including:

(i) Workers' Compensation and Employers' Liability, in amounts prescribed by law;

(ii) Automobile Liability, for owned, non-owned and hired vehicles at an amount not less than $1,000,000, Combined Single Limit;

(iii) Liability insurance written on an occurrence basis, utilizing a combined single limit per occurrence for bodily injury, personal injury and property damage of at least $1,000,000 per occurrence/$2,000,000 aggregate (except as prescribed by law or availability for the above);

(iv) "All risk" insurance covering fire and extended coverage, vandalism and malicious mischief, sprinkler leakage and all other perils of direct physical loss or damage, for the full replacement value of all Franchisee's property or equipment of any nature located at, on, in, or about the **Shop**, or in any way used in the operation of the **Shop**, including all contents, awnings, signs, and glass with reasonable deductibles acceptable to Franchisor; and

(v) Such additional insurance, including casualty loss insurance, as may be required by the terms of any Lease.

In addition to above, Franchisee must obtain an umbrella excess liability policy in

an amount not less than $1,000,000 per occurrence and $1,000,000 per aggregate.

B. Carriers

All policies of insurance shall be in form and in such amounts as Franchisor shall reasonably determine with companies having a rating of A+ or better as determined by A.M. Best and Co. or comparable rating by another nationally recognized rating organization. All companies must be licensed in the state in which the **Shop** is located and must be acceptable to Franchisor. Franchisee shall name Franchisor as an additional insured on all policies.

Franchisee shall furnish Franchisor, certificates indicating that all required insurance is in full force and effect and will not be terminated or changed without at least thirty (30) days prior written notice to Franchisor of each such policy. Upon demand, Franchisee shall deliver a copy of all such insurance policies to Franchisor for examination.

C. Failure to Obtain

Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as revised from time to time for all franchisees, Franchisor shall have the right and authority (without, however, any obligation to do so), to procure such insurance and to charge same to Franchisee, which charges, together with a reasonable fee for Franchisor's expenses in so acting, shall be payable by Franchisee immediately upon notice.

D. Franchisor's Insurance

Franchisee's obligation to obtain and maintain the foregoing policy or policies in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions of this Agreement.

## X. INDEMNIFICATION

Franchisee agrees to defend at its own cost and to indemnify and hold harmless Franchisor, its successors, predecessors, affiliates, assigns and their respective shareholders, members, directors, managers, officers, employees and agents, from and against any and all claims, losses, costs, expenses (including attorneys' fees at all levels), damages, and liabilities arising out of Franchisee's negligence, breach of contract, or other civil or criminal wrong, resulting directly or indirectly from or pertaining to the use, condition, construction, equipping, decorating, maintenance, or operation of the **Shop**. Such losses, claims, costs, expenses, damages, and liabilities shall include without limitation, those arising from latent or other defects in the **Shop**, whether or not discoverable by Franchisee, those involving all federal, state and local employment and labor laws and regulations, all data privacy laws and those arising from the death or injury to any person, or arising from damage to the property of Franchisee or Franchisor, their agents or employees, or any third person, firm, or corporation.

## XI. MARKETING AND RELATED FEES

A. Marketing Fee

1) Recognizing the value of marketing to the goodwill and public image of

**VAPORFI**, Franchisor has established and administers a marketing fund (the "Marketing Fund") for such marketing (including advertising, promotion, public relations and other marketing programs) as Franchisor deems necessary or appropriate, in its sole discretion. Franchisee shall contribute to the Marketing Fund on a monthly basis, an amount equal to a minimum of two percent (2%) of the Revenues for the preceding month, concurrently with the payment of the Royalty. **Shops** owned by Franchisor and its affiliates will contribute to the Marketing Fund on the same basis as Franchisee.

2) Except as otherwise provided below in subsection 3), Franchisor shall direct all marketing programs financed by the Marketing Fund. Franchisor shall have sole discretion over the creative concepts, materials, and endorsements used therein, and the geographic market and media placement and allocation thereof. Franchisee agrees that the Marketing Fund may be used to pay the costs of conducting marketing surveys and research; employing public relations firms; preparing and producing video, audio, and printed marketing materials; designing and hosting Websites and social media presence; administering multi-regional marketing programs, including, without limitation, purchasing television, radio, magazine, billboard, newspaper, and other media advertising, and employing advertising agencies to assist therewith; providing marketing materials to franchisees; and holding conventions and regional meetings for franchisees. The Marketing Fund shall furnish Franchisee with approved marketing materials on the same terms and conditions, as Franchisor furnishes such materials to Franchisor's other franchisees.

3) The Marketing Fund shall be accounted for separately from the other funds of Franchisor and shall not be used to defray any of Franchisor's general operating expenses, except for salaries, administrative costs, and overhead that Franchisor may incur in activities related to the administration of the Marketing Fund and marketing programs financed through the Marketing Fund (including, without limitation, collecting and accounting for contributions to the Marketing Fund.)

4) Franchisor may spend in any fiscal year an amount greater or less than the aggregate contributions of **Shops** to the Marketing Fund in that year and the Marketing Fund may borrow from Franchisor or others to cover temporary deficits in the Marketing Fund or cause the Marketing Fund to invest any surplus for future use by the Marketing Fund. Franchisee authorizes Franchisor to collect any advertising monies or credits due from any distributor or other supplier to Franchisee and any advertising or other rebates or any discounts from distributors and other suppliers based upon purchases or volume purchases by Franchisor and its franchisees (including purchases by Franchisee). Franchisor shall have the right to negotiate with suppliers from time to time to obtain on Franchisor's and/or Franchisee's behalf price reductions, discounts or rebates based on volume purchases. Unless such suppliers designate such payments as being for advertising and promotion (in which event, Franchisor shall contribute same to the Marketing Fund), Franchisor may use such payments for any purposes Franchisor deems appropriate. Any such contributions shall be in addition to all other amounts due or contributed under this Agreement. All interest earned on monies contributed to the Marketing Fund will be used to pay the costs of the Marketing Fund before other assets of the Marketing Fund are expended. A statement of monies collected and expenditures made by the Marketing Fund shall be prepared annually by Franchisor and shall be provided to Franchisee. Franchisor may terminate or suspend the Marketing Fund at any time upon reasonable written notice. In such event, all funds remaining in the Marketing Fund may only be used for advertising and promotional purposes until fully expended.

5) Franchisee understands and acknowledges that the Marketing Fund is intended to be used to develop general public recognition of the Proprietary Marks and increase patronage of **VAPORFI Shops**, in general. Franchisor undertakes no obligation to ensure that expenditures by the Marketing Fund in, or affecting any geographic area, are proportionate or equivalent to contributions to the Marketing Fund by **Shops** operating in any geographic area or that any **Shop** will benefit directly or in proportion to its contribution to the Marketing Fund, from the conduct of marketing programs or the placement of advertising. Except as expressly provided in this paragraph, Franchisor assumes no direct or indirect liability or obligation to Franchisee with respect to the maintenance, direction, or administration of the Marketing Fund. No fiduciary duty or relationship is created by virtue of the existence and/or operation of the Marketing Fund.

6) Franchisor shall have the right, but not the obligation, to establish a Marketing Fund Advisory Committee consisting of franchisees of Franchisor, to advise and consult with Franchisor in connection with establishment, modification, continuance, or other decisions or considerations affecting marketing programs. The organizational structure and manner of operation of such Committee shall be determined by Franchisor in Franchisor's sole discretion, exercised in good faith. Franchisor shall consult with such Committee and consider such Committee's input and advice concerning the use of the Marketing Fund. However, as described in subsections 1) and 2), Franchisor shall retain sole discretion over all aspects, including but not limited to, administration and use of the Marketing Fund.

B. Local Advertising Requirements

In all events, and in addition to the Marketing Fund fee required to be paid by Franchisee pursuant to paragraph XI.B above, Franchisee shall be required to spend monthly on local advertising, a minimum of one percent (1%) of Revenues. Local advertising must be in effect within thirty (30) days after the opening of the **Shop**, and Franchisee is to substantiate local advertising expenditures to Franchisor, by supplying such information as Franchisor may require from time to time, including but not limited to, tear sheets, paid advertising invoices, and like documentation.

Prior to their use by Franchisee, samples of all marketing materials and descriptions of local promotional programs that Franchisee proposes to use, not prepared or previously approved by Franchisor, shall be submitted to Franchisor for approval. If written disapproval is not received by Franchisee within fifteen (15) days from the date of receipt by Franchisor of such materials or descriptions, Franchisor shall be deemed to have given the required approval. Franchisee shall not use any marketing materials that Franchisor has disapproved.

Franchisee shall also be responsible for any Lease obligations which require contributions(s) to a marketing fund, advertising fund, or any fund of a similar nature or other forms of advertising expense and any such contributions or expenditures made by Franchisee to satisfy such Lease obligations shall only reduce Franchisee's obligation to engage in local advertising.

C. Grand Opening Marketing

Within thirty (30) days after the opening of the Franchised Business, Franchisee shall conduct an opening marketing and promotional program in the form and manner prepared by Franchisee and approved by Franchisor in writing. Franchisee shall spend between One

Thousand Five Hundred Dollars ($1,500) and Two Thousand Dollars ($2,000) for such opening program. Franchisee shall furnish to Franchisor, within sixty (60) days after the opening of the Franchised Business, such evidence as Franchisor may reasonably require, to verify such approved expenditure.

D. Electronic Commerce

1) Franchisee may not maintain a site on the Internet/World Wide Web, including on social media or social networking sites (e.g., Facebook; Twitter; Linked-In; YouTube), or otherwise maintain a presence or advertise on the Internet or any other public computer network in connection with the Franchised Business including, but not limited to registering a domain name (whether containing the Proprietary Marks or not), without Franchisor's prior written approval, which Franchisor may withhold for any reason or no reason. The requirement for Franchisor's prior approval set forth in this Section, will apply to all activities on the Internet or other communications network to be conducted by Franchisee, except that Franchisee may maintain one or more e-mail addresses and may conduct individual e-mail communications without Franchisor's prior written approval. Franchisee agrees to obtain Franchisor's prior written approval as provided above, if it proposes to send advertising to multiple addresses via e-mail.

2) Franchisee may not advertise or solicit on the Internet without the prior written approval of Franchisor, which approval Franchisor may refuse to give in its sole and absolute discretion.

F. Gift Card and Promotional Programs

If Franchisor implements a gift card or other promotional program(s), Franchisee shall participate in such program(s). For this purpose, Franchisee shall purchase the software, hardware, and other items needed to sell and process gift cards, as Franchisor may specify in writing in the Confidential Manual or otherwise. Franchisee shall also pay such monthly and per-swipe transaction fees as may be required by the vendor of a gift card system. Franchisee shall not sell, issue, or redeem gift certificates other than gift cards approved by Franchisor in writing.

## XII. COOPERATIVES

A. Formation

Franchisor shall have the right, but not the obligation, at any time, and from time to time, to create Co-op Advertising Regions ("Cooperatives"). If and when Franchisor creates a Cooperative for the geographic region in which the **Shop** is located, Franchisee shall become a member thereof, and participate therein, as shall all **Shops** owned by Franchisor or any affiliate of Franchisor that are within the same geographic region. The size and content of such Cooperatives, when and if established by Franchisor, shall be binding upon Franchisee and all other franchisees similarly situated. At all meetings of such Cooperative, each participating franchisee shall be entitled to one (1) vote for each **Shop** located within such Cooperative. At any time, upon reasonable notice, twenty percent (20%) of the eligible member votes, or a majority of the directors of the Cooperative, may call a meeting of all members of a Cooperative. Except as provided in paragraph B below, all matters concerning operation of a Cooperative shall be decided by majority vote, provided that a quorum is present, and such vote shall bind all members of said Cooperative. For purposes hereof, a quorum shall consist of members entitled to

cast at least 50% of the total number of votes in such Cooperative.

B. Organization

Each Cooperative shall be organized and governed in a form and manner, and shall commence operations on a date, approved in advance by Franchisor, in writing, as follows:

1) Each Cooperative shall be organized for the exclusive purposes of administering regional advertising programs and developing, subject to Franchisor's approval, standardized promotional materials for use by the members in local advertising.

2) No advertising or promotional plans or materials may be used by a Cooperative or furnished to its members without the prior approval of Franchisor.

C. Advertising Contributions

Upon the approval of a majority of the votes represented by all of the members of the Cooperative, each member can be required to contribute to the Cooperative, as determined by the members of the Cooperative. Such amount shall be in addition to the amount required to be contributed to the Marketing Fund, pursuant to paragraph XI.B.1. In the event of approval of such Cooperative advertising contributions as aforesaid, each franchisee, including Franchisee, shall submit its required contribution to the Cooperative, together with such statements as may be required by the Cooperative.

D. Local Advertising Credit

Franchisee's payment of any Cooperative obligation, in accordance with paragraph XII, shall be credited against Franchisee's local advertising requirement described in paragraph XI.C.

## XIII. PAYMENTS

A. Late Payment

If Franchisee shall be delinquent in the payment of any obligation to Franchisor under this Agreement, or under any other agreement with Franchisor, Franchisor shall have the absolute right to apply any payments received from Franchisee to any obligation owed, whether under this Agreement or otherwise, notwithstanding any contrary designation by Franchisee as to application. To encourage prompt payment and to cover the costs and expenses involved in handling and processing late payments, Franchisee shall pay a late payment charge of the greater of Ten Dollars ($10.00) or five percent (5%) of any amount due from Franchisee to Franchisor hereunder. In addition, Franchisee shall pay, at the rate of eighteen percent (18%) per annum, interest on all payments due to Franchisor hereunder during the period for which such payments are overdue, but in the event the rate charged is more than the highest rate permitted by law, then the rate charged shall be reduced to the maximum rate permitted by law.

Any payment not received on or before the date set forth in this Agreement shall be deemed overdue, unless, in the opinion of Franchisor, the delay was beyond the reasonable control of Franchisee. Notwithstanding the foregoing, each failure to pay the Royalty Fee, the Marketing Fund contribution and other payments owed to Franchisor when due, will constitute a breach of this Agreement, entitling Franchisor to pursue all remedies available to it under this

Agreement and all other remedies available at law and in equity.

B. Electronic Funds Transfer

Franchisee must participate in Franchisor's electronic funds transfer program, which authorizes Franchisor to utilize a pre-authorized bank draft system. Franchisee must sign and deliver to Franchisor an unconditional, irrevocable authorization to enable Franchisor's financial institution to debit accounts at Franchisee's bank in order to pay Franchisor all amounts which Franchisee may owe Franchisor under this Franchise Agreement or any other agreement between Franchisee and Franchisor. All amounts due Franchisor must be received by Franchisor or credited to Franchisor's account by pre-authorized bank debit before 2:00 p.m. on the day each such payment is due.

C. Withholding Payments

Franchisee shall not, for any reason, withhold payment of any Royalty Fees or other amounts due to Franchisor. Franchisee shall not withhold or offset any amounts, damages or other monies allegedly due to Franchisee against any amounts due to Franchisor. No endorsement or statement on any payment for less than the full amount due to Franchisor will be construed as an acknowledgment of payment in full, or an accord and satisfaction, and Franchisor has the right to accept and cash any such payment without prejudice to Franchisor's right to recover the full amount due, or pursue any other remedy provided in this Agreement or by law. Franchisor has the right to apply any payments made by Franchisee against any of Franchisee's past due indebtedness as Franchisor deems appropriate. Franchisor shall set off sums Franchisor owes to Franchisee against any unpaid debts owed by Franchisee to Franchisor.

## XIV. REPORTING, RECORD KEEPING AND ACCOUNTING

A. Reports

Franchisee shall record all sales and receipts of revenue and report same to Franchisor. Reports of Royalty Fees and Marketing Fund Contributions must be received by Franchisor no later than the date Franchisor receives the respective payments. Franchisee must also provide monthly operational reports and expense reports, by the tenth (10th) day of the following month. Franchisor's standardized reporting forms must be used by Franchisee. This uniform system may be amended or supplemented from time to time by Franchisor. Franchisee shall be solely responsible for performing all record keeping duties, and the cost for same shall be borne solely by Franchisee. Any intentionally false statements in any reports provided to Franchisor shall be grounds for Franchisor to terminate this Agreement.

B. Records and Audits

Franchisee shall maintain and preserve accurate books, records (including corporate or other entity minute book), and tax returns, including related supporting material, such as computerized records for the **Shop**, for at least three (3) years, following the end of the calendar year to which they relate. Such books, records, tax returns, and supporting material shall be available for inspection, examination, or audit, including an audit by a certified public accountant, at any time, at Franchisor's sole discretion. Such examination or audit shall be at Franchisor's expense, unless it is disclosed that any statement of Gross Sales submitted by Franchisee is in error to the extent of two percent (2%) or more, in which case, such expense

shall be borne by Franchisee. Franchisee shall also immediately pay Franchisor any deficiency in Royalty Fee or Marketing Fund contributions as disclosed by such audit or examination, together with interest at the maximum rate specified by law, or in the absence of a maximum rate specified by law, eighteen percent (18%). In addition, Franchisee shall provide to Franchisor, upon Franchisor's request, true and correct copies of all of Franchisee's databases. Franchisee shall also provide to Franchisor, upon request, a list of all of Franchisee's bank accounts and Franchisee may only use dedicated **VAPORFI** bank accounts in the conduct of the Franchised Business.

C. Financial Statements and Tax Returns

Within thirty (30) days after the close of each calendar or fiscal quarter, Franchisee shall deliver to Franchisor, a complete and accurate profit and loss statement and a balance sheet, prepared in a consistent manner, for the preceding three (3) month period, together with any other data requested by Franchisor, on a form or forms specified by Franchisor, which may include sales tax returns filed with the appropriate governmental agency.

In addition, on or before the expiration of sixty (60) days after the close of Franchisee's fiscal year, for each year during the Term and any renewal term of this Agreement, Franchisee shall deliver to Franchisor, a balance sheet and statement of profit and loss, reflecting the financial condition of the Franchised Business at the end of such fiscal year. Such statements and balance sheets shall be prepared in a consistent manner, in the form specified by Franchisor and shall be accompanied by a letter from a Certified Public Accountant stating that they have been reviewed and certified in writing by Franchisee as being true and correct.

Franchisee shall submit to Franchisor copies of Franchisee's federal, state, and city, if any, income tax and sales tax returns, within ten (10) days after their respective filing, during the initial term and any renewal term.

## XV. TRANSFER

A. Assignment by Franchisor

Franchisor may freely transfer or assign its rights and obligations under this Agreement to any person or business entity. The transfer or assignment will be binding upon and will inure to the benefit of the successors and assigns of Franchisor.

Franchisee agrees that Franchisor has the right, now or in the future, to purchase, merge, acquire or affiliate with an existing competitive or non-competitive franchise network, chain or any other business regardless of the location of that chain's or business' facilities, and to operate, franchise or license those businesses and/or facilities under the Proprietary Marks or any other marks following Franchisor's purchase, merger, acquisition or affiliation, regardless of the location of these facilities (which Franchisee acknowledges may be within the Protected Territory, proximate thereto, or proximate to any of Franchisee's locations). In the event of any territorial conflict or overlap, Franchisor shall use its best efforts but shall not be obligated, to resolve same within nine (9) months of any such purchase, merger, acquisition or affiliation.

Franchisee agrees and affirms that Franchisor may sell itself, its assets, the Proprietary Marks and/or the System to a third party; may go public; may engage in a private placement of some or all of its securities; may merge, acquire other corporations, or be acquired by another

corporation; and/or may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring. With regard to any of the above sales, assignments and dispositions, Franchisee expressly and specifically waives any claims, demands or damages arising from or related to the loss of Franchisor's name, Proprietary Marks (or any variation thereof) and System and/or the loss of association with or identification of Franchisor as the franchisor under this Agreement.

If Franchisor assigns its rights in this Agreement, nothing herein shall be deemed to require Franchisor to remain in business or to offer or sell any products or services to Franchisee.

B. Assignment by Franchisee

1) This Agreement has been entered into by Franchisor in reliance upon and in consideration of the singular personal skill, qualifications and trust and confidence reposed in Franchisee or if Franchisee is a business entity, its owners. Therefore, neither Franchisee's interest in this Agreement nor any of Franchisee's rights or privileges nor any interest in the Franchised Business nor its assets, shall be assigned, transferred, shared or divided, voluntarily or involuntarily, by operation of law or otherwise, directly or indirectly, in any manner, without the prior written consent of Franchisor and subject to Franchisor's right of first refusal as provided for in section D. of this Article XV. Notwithstanding anything herein to the contrary, in the event of the death or legal incapacity of Franchisee or, in the case of a franchisee that is a business entity (as defined in Section XV.E.), an owner of more than twenty percent (20%) of the ownership interest, the transfer of Franchisee's interest in this Agreement or such owner's interest, to his or her heirs, personal representatives or conservators, as applicable, shall require Franchisor's written consent, but shall not give rise to Franchisor's right of first refusal hereunder (as set forth in Section D., hereafter), although such right of first refusal shall apply as to any proposed transfer or assignment by such heirs, personal representatives or conservators.

2) Should Franchisor not elect to exercise its right of first refusal, as set out in Section XV.D., or should such right of first refusal be inapplicable, as herein provided, Franchisor may impose any reasonable condition(s) to the granting of its consent. Without limiting the generality of the foregoing, the imposition of any or all of the following conditions to Franchisor's consent to any such assignment shall be deemed reasonable:

a) that the assignee (or the principal shareholders, members, partners, officers, directors, or managers of the assignee in the case of a corporate, partnership, or limited liability company assignee), demonstrate that the skills, qualifications and economic resources necessary, in Franchisor's judgment, reasonably exercised, to own and operate the **Shop**;

b) that Franchisee submit current, accurate financial statements, prepared in a consistent manner, including a balance sheet and income statement (where relevant under the circumstances), relating to the financial condition of the proposed assignee, reviewed by an independent Certified Public Accountant, federal and state tax returns for the two (2) immediately preceding years, together with any other documents that are required to enable Franchisor to determine the character, credit worthiness, business experience, professional credentials, ethical background, fitness and suitability of the proposed assignee;

c) that the proposed assignee must meet Franchisor's standards for prospective franchisees;

d) that Franchisee must furnish Franchisor with copies of all proposed

sale and/or transfer documents before such documents are executed, and Franchisor determines that the price and terms of payment will not adversely affect the proposed assignee's ability to operate the Franchised Business;

e) that if assignee finances any part of the sale price of the transferred interest, Franchisee must agree that all of the assignee's obligations under any promissory notes, agreements or security interests, that Franchisee has reserved in the franchise, are subordinate to the assignee's obligation to pay all financial obligations to Franchisor as set forth in the franchise agreement to be executed by assignee;

f) that Franchisee sign a general release in a form satisfactory to Franchisor, of any and all claims against Franchisor and Franchisor's shareholders, members, officers, directors, managers, employees, and agents;

g) that the assignee shall have completed, at assignee's cost and expense, Franchisor's training program to Franchisor's satisfaction, exercised in good faith;

h) that as of the date of any such assignment, Franchisee shall have complied with all material obligations to Franchisor, whether under this Agreement or any other agreement, arrangement or understanding with Franchisor;

i) that unless Franchisor agrees otherwise in writing, the assignee shall execute Franchisor's franchise agreement then being offered to prospective franchisees which may be materially different than this Agreement (except that the assignee shall not be obligated to pay the Initial Franchise Fee and the term thereof shall expire on the stated expiration date of this Agreement);

j) that Franchisee shall have expressly agreed in writing to comply with the non-competition covenants set forth in Article XVII hereof and with all other post-termination obligations contained herein; and

k) a transfer fee in an amount equal to the greater of ten percent (10%) of the sales price or $5,000, shall be paid to Franchisor.

3) If Franchisee is a business entity (as defined in Section XV.E.), the death or legal incapacity of any owner owning more than twenty percent (20%) of the ownership interests of Franchisee, the issuance of any securities by Franchisee, the transfer of more than twenty percent (20%) in the aggregate of the ownership interests in Franchisee, by operation of law or otherwise, or any merger, share redemption, consolidation, reorganization or recapitalization involving Franchisee, shall be deemed to be an assignment of this Agreement within the meaning of this Article XV. If Franchisee is a partnership, the legal incapacity, death or withdrawal of any general partner, admission of any additional general partner, or the transfer of any general partner's interest in the property, management or profits and/or losses of the partnership shall be deemed to be an assignment hereunder.

C. Financial and Other Information

Franchisor shall have the right, but not the obligation, to furnish any prospective assignee with copies of all financial statements which have been furnished by Franchisee to Franchisor in accordance with this Agreement during the one (1) year period prior to the date the approval of the proposed assignment, transfer or sale is sought. Franchisor shall also have the right to advise

any prospective assignee of any uncured breaches or defaults by Franchisee under this Agreement, or any other agreement proposed to be assigned, transferred, or sold. Franchisor's approval of such proposed transaction shall not, however, be deemed a representation or guarantee by Franchisor that the terms and conditions of the proposed transaction are economically sound or that, if the transaction is consummated, the assignee will be capable of successfully operating the **Shop** and no inference to such effect shall be made from such approval.

D. Right of First Refusal

Except as expressly provided in paragraph XV.B.1), to the contrary, any assignment of this Agreement, or any interest herein, or of the Franchised Business, shall be subject to Franchisor's right of first refusal with respect thereto. Franchisor's said right of first refusal shall be exercised in the following manner:

1) Franchisee shall serve upon Franchisor a written notice clearly and unambiguously setting forth all of the terms and conditions of the proposed assignment and all available information concerning the proposed assignee, including but not limited to, information concerning the employment history, financial condition, credit history, skill and qualifications of the proposed assignee and, in the case of a partnership, corporate, or limited liability company, assignee, of its partners, shareholders and members, as applicable.

2) Within thirty (30) days after Franchisor's receipt of such notice (or if Franchisor shall request additional information, within thirty (30) days after receipt of such additional information), Franchisor may either consent or withhold its consent to such assignment, in accordance with paragraph XV.B.1), or at its option, accept the assignment to itself or to its nominee upon the terms and conditions specified in the notice. Franchisor may substitute an equivalent sum of cash for any consideration other than cash specified in said notice. If Franchisor fails to exercise any of its rights or options, or otherwise fails to respond, then consent to the proposed assignment shall be deemed withheld.

3) If Franchisor shall elect not to exercise its said right of first refusal and shall consent to such assignment, Franchisee shall, subject to the provisions of paragraph B.1), of this Article XV, consummate the transaction with the proposed assignee on the terms and conditions specified in said notice. If, however, Franchisor elects not to exercise its right of first refusal and the terms shall be materially changed, or if more than ninety (90) days shall pass without the transaction being consummated, such changed terms or lapse of time shall be deemed a new proposal and Franchisor shall again have such right of first refusal with respect thereto.

E. Business Entity

1) This Agreement may not be transferred to a business entity without the prior written approval of Franchisor, which approval shall not be unreasonably withheld. If Franchisee (at any time) becomes a business entity (a corporation, limited liability company, partnership or similar entity), Franchisee and the business entity (which shall then become the Franchisee hereunder), shall agree and represent that:

a) The business entity has the authority to execute, deliver and perform Franchisee's obligations under this Agreement and is duly organized or formed and validly existing in good standing under the laws of the state of its formation and has been formed

for the sole purpose of operating the Franchised Business;

b) The organizational or governing documents do/will recite that the issuance and transfer of any ownership interests are restricted by the terms of this Agreement, and all certificates and other documents representing ownership interests will bear a legend referring to the restrictions of this Agreement;

c) Exhibit "F" to this Agreement will completely and accurately describe all the owners and their interests in the business entity and that the named individual Franchisee will own no less than fifty-one percent (51%) of the ownership interests in the business entity;

d) Franchisee and Franchisee's owners shall revise Exhibit "F", as may be necessary to reflect any ownership changes and to furnish such other information about Franchisee's organization or formation as Franchisor may request;

e) Each of Franchisee's owners and their spouses if any, will sign and deliver Franchisor's Guaranty and Assumption of Obligations (Exhibit "G"), undertaking to be bound jointly and severally by all provisions of this Agreement and any other agreements between Franchisor and Franchisee and Franchisor's Confidentiality, Non-Disclosure and Non-Competition Agreement (Exhibit "H"); and

f) At Franchisor's request, Franchisee will furnish true and correct copies of all documents and contracts governing the rights, obligations and powers of Franchisee's owners and agents (such as, articles of incorporation or organization and partnership, operating or shareholder agreements or similar documents.)

2) The legal name of the business entity shall not contain, consist of or include any of the Proprietary Marks.

3) Subject to the provisions of paragraph XV.B.1), if Franchisee becomes a business entity, any merger thereof or sale or transfer of stock of any class in a corporate Franchisee, or ownership interests in a limited liability company Franchisee, whether by operation of law or otherwise, or the sale or transfer of any general partner's interest or the sale or series of sales or transfers of limited partnership interests (including transfers of shares in corporate partners) in a partnership Franchisee, whether by operation of law or otherwise, or the disposition in any manner of the ownership interests in any other business organization Franchisee, whether by operation of law or otherwise, or a transfer of substantially all of the assets of the Franchised Business, shall be deemed an attempted assignment of this Agreement, requiring the prior written consent of Franchisor.

In addition, future transfers of ownership interests in such business entities will be subject to all the provisions of this Article XV.

F. No Representation or Guarantee

Franchisor's consent to a transfer of this Agreement, the Franchised Business, the **Shop**, or any ownership interest in any business entity controlled by Franchisee, does not constitute a representation as to the fairness of the terms of any contract between Franchisee and any assignee, nor does Franchisor's consent constitute a guarantee of the successful operation of the Franchised Business by the assignee or a waiver of any claims Franchisor has against Franchisee.

G. Offerings by Franchisee

Ownership interests (hereinafter "securities") in Franchisee may be offered to the public, by public or private offering or otherwise, only with the prior written consent of Franchisor, which consent shall not be unreasonably withheld. All materials required for such offering by federal or state law shall be submitted to Franchisor for review prior to their being filed with any government agency, or if they are to be used in any exempt offering, shall be submitted to Franchisor for review prior to their use. No offering by Franchisee shall imply (by use of the Proprietary Marks or otherwise) that Franchisor is participating in an underwriting, issuance, or offering of the Franchisee's securities. The Franchisee must fully indemnify Franchisor in connection with the offering and must require other participants in the offering to also indemnify fully Franchisor. For each proposed offering, the Franchisee shall pay to Franchisor a non-refundable minimum fee of Two Thousand Dollars ($2,000) or such greater amount as is necessary to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the proposed offering, including, without limitation, legal and accounting fees. The Franchisee shall give Franchisor at least sixty (60) days written notice prior to the effective date of any offering or other transaction covered herein.

H. Death or Permanent Disability

If Franchisee is an individual, upon Franchisee's death or permanent disability or, if Franchisee is a business entity, upon the death or permanent disability of an individual owning more than twenty percent (20%) of the ownership interest, the executor, administrator, conservator or other personal representative shall transfer the interest in this Agreement or the ownership interest within a reasonable time, not to exceed nine (9) months from the date of death or permanent disability, to a third party approved by Franchisor. An assignment under this Section, including, without limitation, transfer by devise or inheritance, will be subject to all of the terms and conditions contained in Article XV of this Agreement, and unless transferred by gift, devise or inheritance, subject to Franchisor's right of first refusal. Failure to dispose of such interest within the specified period of time will constitute a breach of this Agreement. For purposes of this Agreement, the term "permanent disability" will mean a mental or physical disability, impairment or condition that is reasonably expected to prevent or actually does prevent Franchisee or an owner of more than twenty percent (20%) of the ownership interest in a business entity from supervising the operation of the Franchised Business for a period of six (6) months from the onset of such disability, impairment or condition.

I. No Encumbrance

Franchisee shall not in any event have the right to pledge, encumber, hypothecate or otherwise give any third party a security interest in this Agreement in any manner whatsoever.

J. Interim Management

1) If a material default under this Agreement occurs and remains uncured, or is not subject to cure, or if Franchisee's actions jeopardize the integrity of the Proprietary Marks or the System, or Franchisee or the owner responsible for the operation of the **Shop**, shall die or become incapable of operating the Franchised Business, then Franchisee authorizes Franchisor to operate the Franchised Business for as long as in Franchisor's reasonable judgment, Franchisor believes that it is necessary or practical. Franchisee acknowledges that this right to "step-in" is

necessary to preserve the value and integrity of the System. Notwithstanding Franchisor exercising this right to step-in, Franchisee agrees that Franchisor does not lose or waive a right to exercise any other rights or remedies which Franchisor may have legally or under this Agreement.

2) During a step-in period, Franchisor will maintain in a separate account, all receipts which the Franchised Business generates. Franchisor will deduct from such account and pay all expenses of the Franchised Business, which will include the Royalty, Marketing Fund contribution and reasonable compensation and expenses for the representatives of Franchisor. If Franchisor exercises these step-in rights, then Franchisee agrees to hold harmless Franchisor and its representatives for all actions or omissions which occur during the course of the temporary operation. Franchisee agrees to pay Franchisor's reasonable attorneys' fees and costs which might arise from the exercise of these step-in rights. Nothing in this Section will prevent Franchisor from exercising any other rights which Franchisor may have under this Agreement, including the right to terminate.

## XVI. PROPRIETARY RIGHTS AND CONFIDENTIALITY

A. Proprietary Rights and Confidentiality

Nothing contained in this Agreement shall be construed to require Franchisor to divulge to Franchisee any confidential or proprietary information, except for the material contained in the Confidential Manual and training materials. Franchisee acknowledges that knowledge of Franchisor's marketing methods, product analysis and selection, service methods, skills relating to the development and operation of a **Shop**, know-how, techniques, information, trade practices and other proprietary data is derived entirely from information disclosed to Franchisee by Franchisor and that such information is proprietary, confidential, and trade secrets of Franchisor (the "Confidential Information"). Franchisee agrees to adhere fully and strictly to all confidentiality attached to such information and to exercise the highest degree of diligence in safeguarding Confidential Information during and after the term of this Agreement. Franchisee shall divulge such material only to employees and only to the extent necessary to permit the effective operation of the **Shop**. It is expressly agreed that the ownership of all of the Confidential Information is and shall remain vested solely in Franchisor and that all customer lists and associated data and information obtained in the first instance by Franchisee is and shall be the exclusive property of Franchisor.

Franchisee further agrees that Franchisee:

1) will not use the Confidential Information in any other business or capacity;

2) will maintain the absolute confidentiality of the Confidential Information during and after the term of this Agreement;

3) will not make unauthorized copies of any portion of the Confidential Information disclosed in any form including, but not limited to: electronic media, written form, or other tangible forms; and

4) will adopt and implement all reasonable procedures prescribed by Franchisor, from time to time, to prevent unauthorized use and/or disclosure of the Confidential Information, including restrictions on disclosure to the employees and the use of nondisclosure

and non-competition agreements that the Franchisor may prescribe for persons having access to Confidential Information.

However, disclosure of the Confidential Information may be made in judicial or administrative proceedings, but when and only to the extent Franchisee is legally compelled to disclose same, provided that Franchisee first gives Franchisor the opportunity to obtain an appropriate protective order or other assurance that the confidential nature of the material to be disclosed will be maintained.

Franchisee further agrees that if, in the course of the operation of the **Shop**, Franchisee and Franchisee's employees and/or associates develop ideas, concepts, methods, techniques and/or improvements ("improvements"), Franchisee agrees to disclose same to Franchisor. Franchisor will be deemed to own the improvements and may use them and authorize other franchisees to use them in the operation of their businesses. Improvements will also constitute Confidential Information.

## XVII. NON-COMPETITION

A. Restrictive Covenant

1) In-Term and Post-term

Franchisee agrees that for so long as this Agreement is in effect and for a period of two (2) years immediately following its expiration, non-renewal or termination for any reason, Franchisee will not, either directly or indirectly, as a proprietor, partner, investor, lender, shareholder, director, officer, member, manager, employee, principal, agent, representative, advisor, franchisor, franchisee, consultant or otherwise, engage in any business which competes directly or indirectly with the System, if such other business is located at, or within ten (10) miles of, the Franchise Location or the location of any other **VAPORFI**. Nothing in this Agreement shall prevent Franchisee or its shareholders, directors, officers (if a corporation), partner (if a partnership), members and managers (if a limited liability company), or employees from owning for investment purposes up to an aggregate of two (2%) of the capital stock of any competitive business that is a publicly held corporation whose stock is listed and traded on a national or regional stock exchange, or through the National Association of Securities Dealers Automated Quotation System (NASDAQ), provided that Franchisee does not control any such company.

The foregoing prohibition shall also preclude Franchisee, directly or indirectly from:

a) recruiting or hiring any employee of Franchisor or Franchisor's affiliates or other franchisees without prior written consent; and/or

b) knowingly engaging in any activity to solicit, encourage, or induce any customer doing business with any other franchisee (wherever located) to commence doing business with Franchisee, except with Franchisor's prior written consent; and/or

c) on behalf of Franchisee or any other person or entity, or as an employee, proprietor, owner, consultant, agent, contractor, employer, affiliate, partner, officer, director, manager or associate, stockholder or member of any other person or entity, or in any other capacity, solicit, divert, take away, or interfere with any of the business, customers, clients,

contractors, trade or patronage of Franchisor, or Franchisor's affiliates, as same may exist during the term of this Agreement, except with prior written consent.

For purposes of the foregoing:

a) "Competitive Business": means the operation of any other business, that provides the same or similar products and services featured under the Proprietary Marks.

b) "Directly or indirectly": includes, but is not limited to, all persons (natural or otherwise) under Franchisee's control, and a person's spouse, children, parents, brothers, sisters, any other relative, friends, trustees, agents or associates.

c) "Franchisee": means an individual Franchisee and for a business entity Franchisee, all persons owning any ownership interest therein.

2) Independent Covenants

The parties agree that each of the forgoing covenants shall be construed as independent of any other covenant or provision of this Agreement. The parties further agree that the foregoing restrictions limit Franchisee's right to compete only to the extent necessary to protect Franchisor from unfair competition. Should any part of one or more of these restrictions be found to be unenforceable by virtue of its scope in terms of area, business activity prohibited or length of time, and should such part be capable of being made enforceable by reduction of any or all thereof, Franchisee and Franchisor agree that the same shall be enforced to the fullest extent permissible under the law. In addition, Franchisor may, unilaterally, at any time, in its sole discretion, revise any of the covenants in paragraph A, so as to reduce the obligations of Franchisee hereunder. The running of any period of time specified in paragraph A shall be tolled and suspended for any period of time in which Franchisee is found by a court of competent jurisdiction or an arbitrator to have been in violation of any restrictive covenants. Franchisee further expressly agrees that the existence of any claim it may have against Franchisor whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Paragraph.

3) Enforcement of Covenants Not to Compete

Franchisee acknowledges that a violation of the terms of the covenants not to compete in this Agreement would result in immediate or irreparable injury to Franchisor for which no adequate remedy at law may be available. Accordingly, Franchisee hereby consents to the entry of an injunction prohibiting any conduct by Franchisee in violation of the terms of the covenants not to compete set forth in this Paragraph XVII. Franchisee further agrees to pay all costs and expenses (including reasonable attorney's fees at all levels) incurred by Franchisor in connection with the enforcement of the covenants not to compete set forth in this Paragraph.

4) Separate Agreement

If applicable to Franchisee's form of organization, all owners, officers, directors, managers and key management personnel (regardless of title, the "Covenantors"), except for those signing in compliance with paragraph XV.E.1(e), shall execute Franchisor's Confidentiality, Non-Disclosure and Non-Competition Agreement (Exhibit "H").

B. Non-Disclosure

At no time during or after the term of this Agreement, shall the Covenantors disclose any Confidential Information of Franchisor, including, without limitation, the contents of the Confidential Manuals, other manuals, or training materials, except as provided herein.

## XVIII. RELATIONSHIP OF THE PARTIES

A. Independent Contractors

In all matters pertaining to the operation of the Franchised Business, Franchisee is and shall be an independent contractor. Franchisee shall conspicuously identify Franchisee in all dealings with customers, suppliers, public officials, and others as the owner of the Franchised Business, pursuant a franchise with Franchisor and shall place such other notices of independent ownership on such forms, business cards, stationery, advertising, and other materials as Franchisor may require from time to time. Nothing herein contained shall be construed to create a partnership, joint venture, agency or fiduciary relationship between Franchisee and Franchisor. Neither party here shall be liable for the debts or obligations of the other, unless same are expressly assumed in writing. Franchisee acknowledges that while Franchisor has responsibility for the integrity, promotion and quality of the **VAPORFI** brand, the Proprietary Marks and the goods and/or services associated therewith, Franchisee is solely responsible for the day-to-day decisions and operations of the Franchise Business consistent with System policies and standards.

B. Employment Relations

Franchisee's employees are solely the employees of Franchisee; Franchisor has no control, obligation, or responsibility for or to Franchisee's employees or Franchisee's employment policies or decisions. As to Franchisee's employees, Franchisee is solely responsible for: their hiring, firing; promotion or demotion; employment policies, including employee relations; human resources matters; controlling work schedules and conditions of employment (e.g., meal and rest breaks, time-keeping); determining pay rates, method of payment and classification; benefits and maintenance of employment records; monitoring performance; and training and supervision.

## XIX. DEFAULT AND TERMINATION

The occurrence of any of the following events shall constitute a default by Franchisee under this Agreement. Franchisor may, at its option, and without waiving its rights hereunder or any other rights available at law or equity, including its right to damages, terminate this Agreement and all of the Franchisee's rights hereunder consistent with A. and B. below, as follows:

A. Acts of Immediate Termination

If during any period in which this Agreement is in effect, there occurs any of the following events, immediate written notice of termination, without an opportunity to cure, shall be deemed reasonable:

1) Bankruptcy and Insolvency

If Franchisee, becomes insolvent or commits an act of bankruptcy, or makes a general assignment for the benefit of creditors or to an agent authorized to liquidate Franchisee's property or assets, or becomes involuntarily bankrupt, or voluntarily files a petition in bankruptcy or reorganization, or effects a plan or other arrangement with creditors, or files an answer to the creditors' petitions filed against Franchisee (admitting the material allegations thereof) for an adjudication or for reorganization, or effects a plan or other arrangement with creditors, or applies for or suffers the appointment of a receiver or trustee of any of Franchisee's assets or property, or such receiver or trustee is appointed for any of Franchisee's property or assets.

2) Failure to Operate - Abandonment

Franchisee abandons the Franchised Business by failing to operate the Franchised Business for five (5) consecutive days during which Franchisee is required to operate the Franchised Business under the terms of this Agreement, or any shorter period, after which it is not unreasonable under the facts and circumstances for Franchisor to conclude that Franchisee does not intend to continue to operate the Franchised Business, unless such failure to operate is due to fire, flood, earthquake, or other similar cause beyond Franchisee's control.

3) Misrepresentation

Franchisee makes any material misrepresentations relating to the acquisition of the Franchised Business, or Franchisee engages in conduct which reflects materially and unfavorably upon the operation and reputation of the Franchised Business or the System or Franchisor.

4) Foreclosure

The Franchised Business or Franchise Location is seized, taken over, or foreclosed by a government official in the exercise of his duties, or seized, taken over, or foreclosed by a creditor, lienholder, or lessor; or a final judgment against Franchisee remains unsatisfied for thirty (30) days (unless a supersedeas or other appeal bond has been filed); or a levy or execution has been made upon the license granted by this Agreement or upon any property used in the Franchised Business, and same is not discharged within five (5) days of such levy or execution.

5) Criminal Misconduct

Franchisee, or a controlling owner, if a Franchisee is a business entity, is convicted of a felony or any other criminal misconduct which is relevant to the operation of the Franchised Business.

6) Repeated Failures to Comply

If Franchisee, on three (3) occasions during any twelve (12) month period, commits the same or similar defaults or violations of this Agreement, whether or not corrected after notice from Franchisor to Franchisee.

B. Acts Requiring Period to Cure Before Termination

In the event Franchisee is in default in the performance of any of the terms of this

Agreement (other than those calling for immediate termination set forth above), including, but not limited to, the acts set forth hereinafter, Franchisor, in addition to all remedies that Franchisor has available to it at law or in equity, may declare this Agreement automatically terminated, unless such default is cured within thirty (30) days (or a lesser period as stated hereinafter) after written notice thereof from the Franchisor to the Franchisee, unless the default is of such a nature that more than thirty (30) days are reasonably required to effect a cure. In such event, Franchisee shall commence to cure the default within said thirty (30) day period and shall proceed with due diligence within the period, if any, designated by Franchisor as the allowable additional time within which the cure must be accomplished. Subject to the aforesaid right to cure, Franchisor may terminate this Agreement under the following circumstances and conditions:

1) Other Agreements

Default under any other agreement between Franchisee and Franchisor, including the Promissory Note for the balance of the Initial Franchise Fee, or under the Lease, which default is not cured within the period required in said agreement(s). A default under this Agreement shall be deemed a default under any other Franchise Agreement between Franchisor and Franchisee.

2) Transfer Without Prior Consent

Any attempted assignment, transfer, or sublicense of this franchise, the Franchised Business, the **Shop** or any right under this Agreement, without the prior written consent of Franchisor.

3) Loss of Franchise Location

If during the term of this Agreement, or any extension or renewal thereof, the right to occupy the Franchise Location is lost and a new location, satisfactory to Franchisor and Franchisee, is not leased within ninety (90) days of the termination of the right to occupy the Franchise Location.

4) Failure to Operate

Failure to operate the **Shop** during such days and hours as may be specified in accordance with this Agreement.

5) Failure to Pay Obligations to Third Parties

Failure of Franchisee to make timely payments upon any obligation of Franchisee to persons other than Franchisor.

6) Loss of License

Any license, permit, authorization, certificate or other governmental approval required to operate the Franchised Business is suspended, revoked, cancelled, declared void, terminated, expires or otherwise becomes invalid.

7) Failure to Open

Failure to find a site for the **Shop** within thirty (30) days after the execution of

this Agreement or failure to open the **Shop** for business within one hundred thirty-five (135) days after securing the site for the Franchised Business.

8) Failure to Pay Obligations to Franchisor

Franchisee fails to pay any amounts due to Franchisor or an affiliate of Franchisor, within five (5) days after receiving written notice that any such amounts are overdue.

9) Failure to Comply with Governmental Regulation

Franchisee fails, for a period of ten (10) days after notification of non-compliance, to comply with any federal, state, or local law, rule or regulation applicable to the operation of the franchise.

10) Danger to Public Health

Franchisor makes a reasonable determination that continued operation of the **Shop** by Franchisee will result in an imminent danger to public health or safety.

11) Failure to Meet Standards

If Franchisee shall fail, within ten (10) days of receipt of written notice from Franchisor to conform its operations to the standards of the System.

12) Failure to Comply

Failure to comply with other terms, covenants, obligations, or conditions, of this Agreement, whether or not such other terms specifically provide for termination for non-compliance.

C. Termination By Franchisee

Franchisee may not terminate this Agreement prior to the expiration of its term, upon a material breach of this Agreement by Franchisor, unless Franchisee shall claim that Franchisor has failed to meet such material obligation under this Agreement and Franchisee shall provide Franchisor with written notice of such claim, within one (1) year of its occurrence, specifically enumerating all alleged deficiencies and providing Franchisor with an opportunity to cure, which shall in no event be less than sixty (60) days from the date of receipt of such notice by Franchisor from Franchisee. Failure by Franchisee to give such notice shall constitute a waiver by Franchisee of any such alleged default.

D. Right of Franchisor to Discontinue Services to Franchisee

If Franchisee is in breach of any obligation under this Agreement, and Franchisor provides to Franchisee a notice of termination pursuant to Section XIX, Franchisor has the right, in its sole discretion, to suspend its performance of any of its obligations under this Agreement including, without limitation, the sale or supply of any services or products for which Franchisor is an/the Approved Supplier to Franchisee, until such time as Franchisee corrects the breach.

## XX. POST TERMINATION

A. Discontinuance After Termination

In the event of termination of this Agreement or the franchise for any reason, Franchisee forfeits any and all fees paid and will no longer use the Proprietary Marks or any other property connected with the franchise. Franchisee must immediately cease use of all proprietary property of Franchisor. Franchisee shall immediately return all Confidential Manuals, training materials, Confidential Information and other property of Franchisor and shall not operate or do business under any name or in any manner that might tend to give the general public the impression that the former Franchisee is operating a business similar to **Shops** franchised by Franchisor. The foregoing restrictions shall also apply when this Agreement expires.

Franchisee shall, at the election of Franchisor, within thirty (30) days of termination or expiration of this Agreement, either change all telephone numbers and other public information listings which designate the **Shop** as a **VAPORFI**, including any fictitious or assumed name registrations, or shall execute all documents necessary to transfer to Franchisor, or Franchisor's nominee, the right to use and control all telephone numbers for the **Shop**. In the event that Franchisee shall fail or refuse to execute such documents within the time period, Franchisor is hereby irrevocably appointed as Franchisee's attorney-in-fact to do so.

If Franchisee remains in possession of the Franchise Location, Franchisee, at Franchisor's request, will be required at Franchisee's sole cost and expense to de-identify and redecorate the Franchise Location to prevent the public from believing the Franchise Location continues as a business that competes with the System.

B. Return of Confidential Manual Upon Termination

Immediately upon the termination or expiration of this Agreement, for whatever reason, Franchisee agrees to cease and forever abstain from using the Confidential Information or any part thereof or any trade secrets contained therein, to return to Franchisor all copies of the Confidential Manual, in all its forms, and all other documents, instructions, display items, advertising material, training tools, client lists; accounts receivable and payable; and other tangible property connected with the franchise, and to remove all signs and other items tending to identify the **Shop** as being connected with Franchisor or the System.

C. Assumption of Franchise Location.

Upon termination, expiration or refusal to renew or extend this Agreement for any reason, whether by Franchisee or Franchisor, Franchisor shall be entitled at its option, to assume Franchisee's status and replace Franchisee as lessee under the Lease. Franchisee, upon exercise of that right by Franchisor, will be fully released and discharged from future rents, future lease charges and all other future liabilities under the particular lease by Franchisor if specifically permitted under the lease (although not from any liability for unpaid amounts or rents or any other liability to the lessor under any such lease existing upon said exercise date). For purposes hereof, Franchisee hereby irrevocably appoints Franchisor as Franchisee's attorney-in-fact for the limited purpose upon termination of this Agreement to do any act and execute any document on Franchisee's behalf to effect any such assumption of Franchisee's status and replacement of Franchisee as lessee under any such equipment lease and/or any Lease, which power of attorney is coupled with an interest and may be relied upon by any third parties.

D. Obligations Upon Termination

In the event of termination, expiration or non-renewal, all obligations of Franchisor to Franchisee and all rights of Franchisee under this Agreement shall automatically terminate; however, any obligations of Franchisee to take, or abstain from taking, any action upon termination, expiration or non-renewal, pursuant to this Agreement, shall not be affected by such termination, expiration or non-renewal, including the payment to Franchisor of all sums due from Franchisee at the time of termination, expiration or non-renewal.

E. Liquidated Damages

If termination is the result of the Franchisee's default, Franchisee will pay to Franchisor within fifteen (15) days of the termination date, a lump sum payment (as liquidated damages for causing the premature termination of this Agreement and not as a penalty) equal to the average monthly Royalty Fees paid by Franchisee for the twenty-four (24) month period immediately preceding the date of termination. The parties acknowledge that a precise calculation of the full extent of the damages that Franchisor will incur on termination of this Agreement as a result of Franchisee's default is difficult and the parties desire certainty in this matter, and agree that the lump sum payment provided for under this Section is reasonable in light of the damages for premature termination that the Franchisor will incur in such event. This payment is not exclusive of any other rights and remedies of the Franchisor.

## XXI. NOTICES

A. Writing

All notices, requests, demands, payments, consents and other communications hereunder shall be transmitted in writing and shall be deemed to have been duly given when sent by registered or certified United States mail, postage prepaid, recognized overnight carrier, or other form of delivery which provides for a receipt, addressed as follows:

FRANCHISOR: **VAPORFI FRANCHISING, LLC**
14300 Commerce Way
Miami Lakes, Florida 33016

FRANCHISEE: WALTER HINTON [signature]
[signature] MONICA HINTON
4221 CLUB DR. NE
Atlanta, GA 30319

B. Address Change

Either party may change such party's address by giving notice of such change of address to the other party.

C. Mailed Notice

Mailed notices shall be deemed communicated within three (3) days from the time of mailing, if mailed as provided in this paragraph, regardless if delivery shall be refused by addressee.

## XXII. MISCELLANEOUS

A. Injunction

Nothing contained in this Agreement shall bar Franchisor's right to obtain specific performance and injunctive relief. Franchisee recognizes the unique value and secondary meaning attached to the System, the Proprietary Marks, standards of operation, trade secrets and Confidential Information (for this purpose collectively, the "Proprietary Property") and Franchisee agrees that any non-compliance with the terms of this Agreement or any unauthorized or improper use of the Proprietary Property will cause irreparable damage to Franchisor and its franchisees. Franchisee therefore agrees, that if it should engage in any such unauthorized or improper use of the Proprietary Property, during or after the Term, Franchisor shall be entitled to both permanent and temporary injunctive relief from any court of competent jurisdiction, in addition to any other remedies prescribed by law.

B. Additional Actions

The parties agree to execute such other documents and perform such further acts as may be necessary or desirable to carry out the purposes of this Agreement.

C. Heirs, Successors, and Assigns

This Agreement shall be binding and inure to the benefit of the parties, their heirs, successors, and assigns.

D. Entire Agreement

THE UNDERSIGNED ACKNOWLEDGES THAT THEY, AND EACH OF THEM, HAVE READ THIS AGREEMENT IN FULL; HAVE BEEN SUPPLIED WITH A DISCLOSURE DOCUMENT IN ACCORDANCE TO FEDERAL AND STATE LAW; ARE COGNIZANT OF EACH AND EVERY ONE OF THE TERMS AND PROVISIONS HEREOF AND ARE AGREEABLE THERETO; THAT NO REPRESENTATIONS OR AGREEMENTS, WHETHER ORAL OR WRITTEN, EXCEPT AS HEREIN SET FORTH, HAVE BEEN MADE OR RELIED UPON; THAT THE SIGNATURES AFFIXED HERETO WERE AFFIXED AS THE WHOLLY VOLUNTARY ACT OF THE PERSONS WHO SIGNED THIS AGREEMENT; AND THAT THE TERMS AND PROVISIONS OF THIS AGREEMENT CANNOT BE CHANGED OR MODIFIED UNLESS IN WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF FRANCHISOR; THAT THE UNDERSIGNED REALIZES THAT THERE CAN BE NO GUARANTY OF SUCCESS, SINCE FRANCHISEE'S BUSINESS ABILITY, APTITUDE, AND INDUSTRIOUS DISPOSITION ARE PRIMARY IN FRANCHISEE'S SUCCESS. NOTHING IN THIS OR IN ANY RELATED AGREEMENT, IS INTENDED TO DISCLAIM THE REPRESENTATIONS FRANCHISOR HAS MADE IN THE FRANCHISE DISCLOSURE DOCUMENT FURNISHED TO YOU BY THE FRANCHISOR.

E. Waiver of Rights

Failure by either party to enforce any rights under this Agreement shall not be construed as the waiver of such rights. Any waiver, including waiver of default, in any one instance, shall

not constitute a continuing waiver or a waiver in any other instance. Any acceptance of money or other performance by Franchisor from Franchisee shall not constitute a waiver of any default, except as to the payment of the particular payment or performance so received. During any period that Franchisee is not current as to payment of the Royalty due hereunder, Franchisor shall be under no obligation to provide any assistance, advice, or services to Franchisee.

F. Validity of Parts

Any invalidity of any portion of this Agreement shall not affect the validity of the remaining portion, and unless substantial performance of this Agreement is frustrated by any such invalidity, this Agreement shall continue in effect.

G. Headings

The headings used herein are for purposes of convenience only and shall not be used in interpreting the provisions hereof. As used herein, the male gender shall include the female and neuter genders; the neuter gender shall include the male and female genders; the singular shall include the plural, the plural, the singular and termination shall include expiration.

H. Execution by Franchisor

This Agreement shall not be binding on Franchisor unless and until it shall have been accepted and signed by an authorized officer of Franchisor.

I. Third Parties

The parties intend to confer no benefit or right on any person or entity not a party to this Agreement, and no third party shall have the right to claim the benefit of any provision hereof as a third-party beneficiary of any such provision.

J. Attorneys' Fees

If Franchisor becomes a party to any litigation concerning this Agreement, the Franchise Location, the Franchised Business or the **Shop** by reason of any act or omission of Franchisee or Franchisee's representatives and not by any act or omission of Franchisor or any act or omission of its authorized representatives, Franchisee shall be liable to Franchisor for reasonable attorneys' fees and court costs incurred by Franchisor in such litigation, at all trial and appellate levels.

K. Governing Law

Except to the extent this Agreement or any particular dispute is governed by the U.S. Trademark Act of 1946 (Lanham Act, 15 U.S.C. § 1051 and the Sections following) or other federal law, this Agreement shall be governed by and construed in accordance with the internal laws of the state of Florida; however, if this Agreement concerns a **Shop** located in a state other than Florida and the laws of that state require terms other than those or in addition to those contained herein, then this Agreement shall be deemed modified so as to comply with the appropriate laws of such state, but only to the extent necessary to prevent the invalidity of this Agreement or any provision hereof, the imposition of fines or penalties, or the creation of civil or criminal liability on account thereof. Any provision of this Agreement which may be determined

by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of the prohibition or unenforceability, without invalidating the remaining provisions of this Agreement. Any prohibition against or unenforceability of any provision of this Agreement in any jurisdiction, including the state whose law governs this Agreement, shall not invalidate the provision or render it unenforceable in any other jurisdiction. To the extent permitted by applicable law, Franchisee waives any provision of law which renders any provision of this Agreement prohibited or unenforceable in any respect.

L. Dispute Resolution.

1) The Federal Arbitration Act will govern all questions about the enforceability and scope of Subsection XXII.L.2) and no arbitration issues will be resolved under any state statutes, regulations or common law.

2) The parties hereby agree to submit any claim or dispute, disagreement, or matter pertaining to interpretation of this Agreement, or issues arising out of or relating to the offer and sale of the franchise, this Agreement, the breach thereof, the relationship between Franchisor and Franchisee or any other issue or dispute under this Agreement (the "Dispute"), except as otherwise specified in this Subsection or in Subsection XVII.A.1) above, to binding arbitration before the American Arbitration Association in Miami, Florida. The hearing shall be conducted in accordance with rules governing commercial disputes as promulgated by the American Arbitration Association. There shall be one (1) neutral arbitrator chosen from a list maintained by the American Arbitration Association. The individual shall be experienced in the operation of franchise systems either as attorney, accountant or businessperson. Unless prohibited by applicable law, any Dispute must be brought by filing a written demand for arbitration within one (1) year following the conduct, act or other event or occurrence first giving rise to the claim; otherwise, the right to any remedy shall be deemed forever waived and lost. The arbitrator shall render a binding and legally enforceable award that may be confirmed by a court of competent jurisdiction upon application of the prevailing party. Each party shall initially bear its own attorneys' fees and other costs of the arbitration plus 50% of the cost of any arbitration fees or costs. The arbitrator, however, shall in his/her discretion have the authority to award to the prevailing party all costs of the proceeding, including the arbitrator's costs, out-of-pocket disbursements and reasonable attorneys' fees. The arbitrator will not have the authority to: (a) award exemplary or punitive damages; (b) stay the effectiveness of any pending termination of this Agreement; or (c) render any award that modifies or suspends any lawful provision of this Agreement.

3) Any Dispute and any arbitration will be conducted and resolved on an individual basis only and not a class-wide, multiple plaintiff or similar basis. Any such arbitration proceeding will not be consolidated with any other arbitration proceeding involving any other person, except for disputes involving affiliates of the parties to such arbitration. The parties agree that, in connection with any such arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by the Federal Rules of Civil Procedure) within the same proceeding as the Dispute to which it relates. Any such Dispute which is not submitted or filed in such proceeding will be barred. Any arbitration award will have a binding effect only on the actual Dispute arbitrated, and will not have any collateral effect on any other Dispute whatsoever, whether in litigation, arbitration, mediation, or other dispute resolution proceeding.

4) Notwithstanding the foregoing, the infringement of the Proprietary Marks,

the System or copyrighted items, unauthorized disclosure of Confidential Information, violations of the confidentiality or non-competition covenants may cause irreparable harm to Franchisor, other **VAPORFI** franchisees and the System as a whole. Accordingly, claims by either party related to these acts shall not be subject to the arbitration procedure, including but not limited to, claims for liquidated or punitive damages arising from any such infringement, unauthorized disclosure, or violation of a non-solicitation or non-disclosure covenant.

5) In the event any legal proceedings between the parties arise under this Agreement, the prevailing party will be entitled to recover reasonable attorneys' fees and court costs from the other party, at all trial and appellate levels.

6) No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor will it be deemed, exclusive of any other right or remedy under this Agreement or by law or equity provided or permitted, but each will be cumulative of every other right or remedy.

M. Jurisdiction and Venue

Except as otherwise set forth above in Section XXII.L., pertaining to arbitration, each of the parties irrevocably and unconditionally: (a) agrees that any suit, action or legal proceeding arising out of or relating to this Agreement shall only be brought in the court(s) of record for the State and County or the United States District Court, whose jurisdiction encompasses the location of the principal office of the Franchisor; (b) consents to the jurisdiction of each such court in any suit, action or proceeding; (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts; and (d) agrees that service of any court paper may be effected on such party by mail, as provided in this Agreement, or in such other manner as may be provided under applicable laws or court rules of the State of Florida; provided, however, that Franchisor may obtain injunctive relief in any appropriate forum against the actual or threatened conduct that will cause loss or damage, under the usual equity rules.

N. JURY TRIAL WAIVER

FRANCHISOR AND FRANCHISEE IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THEM.

O. LIMITATION OF ACTIONS

ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND THE FRANCHISOR OR THE FRANCHISEE'S OPERATION OF THE FRANCHISE, BROUGHT BY FRANCHISEE, SHALL BE COMMENCED WITHIN EIGHTEEN (18) MONTHS FROM THE OCCURRENCE OF THE FACTS GIVING RISE TO ANY SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED.

P. WAIVER OF PUNITIVE DAMAGES

THE FRANCHISOR AND FRANCHISEE (AND ITS OWNERS AND GUARANTORS, IF APPLICABLE), HEREBY WAIVE TO THE FULLEST EXTENT

PERMITTED BY LAW, ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT IN THE EVENT OF ANY DISPUTE BETWEEN THEM, EACH SHALL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED BY IT.

Q. No Implied Covenant

Franchisor and Franchisee have negotiated the terms of this Agreement and both parties agree that neither party shall claim the existence of any implied covenant of good faith and fair dealing in contravention of, or as a limitation of any term of this Agreement.

## XXIII. NO PROJECTIONS OR REPRESENTATIONS

Franchisee acknowledges and represents that no projections or representations regarding the amount of income, sales, or profits Franchisee can expect to earn or receive from the franchise granted hereby has been received from Franchisor. Franchisee acknowledges that no representations or warranties inconsistent with this Agreement were made to induce Franchisee to execute this Agreement.

Franchisee acknowledges that neither Franchisor nor any other person can guarantee the success of the business of Franchisee.

The undersigned Franchisee, by signing this Agreement, acknowledges that he/she has read same and that he/she has been requested to state in writing hereafter any terms, claims, covenants, promises, or representations, including representations as to any income, sales, or profit projections, that were made to Franchisee by Franchisor or its representatives, including the persons making same, the location, and date thereof. If no such representations, were made, the undersigned is to write the word: "NONE" NNE WH Initials (A blank shall be the same as if "NONE" is written.) WH 2/9/?

## XXIV. ACKNOWLEDGMENTS.

Franchisee hereby acknowledges the following:

(a) FRANCHISEE HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF THE BUSINESS CONTEMPLATED BY THIS AGREEMENT AND UNDERSTANDS AND ACKNOWLEDGES THAT THE BUSINESS CONTEMPLATED BY THIS AGREEMENT INVOLVES BUSINESS RISKS MAKING THE SUCCESS OF THE VENTURE LARGELY DEPENDENT UPON THE BUSINESS ABILITIES AND PARTICIPATION OF FRANCHISEE AND ITS EFFORTS AS AN INDEPENDENT BUSINESS OPERATOR.

(b) FRANCHISEE HAS NO KNOWLEDGE OF ANY REPRESENTATIONS BY FRANCHISOR OR ITS OFFICERS, DIRECTORS, MANAGER, SHAREHOLDERS, MEMBERS, EMPLOYEES, AGENTS OR SERVANTS, ABOUT THE BUSINESS CONTEMPLATED BY THIS AGREEMENT THAT ARE CONTRARY TO THE TERMS OF THIS AGREEMENT OR THE DOCUMENTS INCORPORATED HEREIN. FRANCHISEE REPRESENTS, AS AN INDUCEMENT TO FRANCHISOR'S ENTRY INTO THIS AGREEMENT, THAT IT HAS MADE NO MISREPRESENTATIONS IN OBTAINING THIS AGREEMENT.

(c) FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR OR ITS AGENT HAS PROVIDED FRANCHISEE WITH A FRANCHISE DISCLOSURE DOCUMENT NOT LATER

THAN THE EARLIER OF FOURTEEN (14) DAYS BEFORE THE EXECUTION OF THIS AGREEMENT, OR FOURTEEN (14) DAYS BEFORE ANY PAYMENT OF ANY CONSIDERATION. FRANCHISEE FURTHER ACKNOWLEDGES THAT FRANCHISEE HAS READ SUCH FRANCHISE DISCLOSURE DOCUMENT AND UNDERSTANDS ITS CONTENTS.

(d) FRANCHISEE ACKNOWLEDGES THAT IT HAS HAD AMPLE OPPORTUNITY TO CONSULT WITH FRANCHISEE'S OWN ATTORNEYS, ACCOUNTANTS AND OTHER ADVISORS AND THAT THE ATTORNEYS FOR FRANCHISOR HAVE NOT ADVISED OR REPRESENTED FRANCHISEE WITH RESPECT TO THIS AGREEMENT OR THE RELATIONSHIP THEREBY CREATED.

(e) FRANCHISEE, TOGETHER WITH FRANCHISEE'S ADVISERS, HAS SUFFICIENT KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS TO MAKE AN INFORMED INVESTMENT DECISION WITH RESPECT TO THE FRANCHISE.

(f) FRANCHISEE IS AWARE OF THE FACT THAT OTHER PRESENT OR FUTURE FRANCHISEES OF FRANCHISOR MAY OPERATE UNDER DIFFERENT FORMS OF AGREEMENT(S), AND CONSEQUENTLY THAT FRANCHISOR'S OBLIGATIONS AND RIGHTS WITH RESPECT TO ITS VARIOUS FRANCHISEES MAY DIFFER MATERIALLY IN CERTAIN CIRCUMSTANCES.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**VAPORFI FRANCHISING, LLC**

BY: [signature] Marc Wax

COO , ~~President~~

FRANCHISEE

[signature] MONICA HINTON

[signature] Walter Hinton

(Signature and Printed or Typed Name)

# Exhibit B

# VAPORFI

# DEVELOPMENT AGREEMENT

MONICA HINTON
WALTER HINTON

**Developer**

**TABLE OF CONTENTS**


INTRODUCTION ........ 1
I. DEFINITIONS ........ 1
II. GRANT AND ACCEPTANCE ........ 2
III. TERM ........ 2
IV. DEVELOPMENT FEE ........ 2
V. DEVELOPMENT PROCEDURES ........ 3
VI. FORCE MAJEURE ........ 4
VII. DEFAULT AND TERMINATION ........ 4
VIII. POST TERMINATION OBLIGATIONS OF DEVELOPER ........ 6
IX. ASSIGNMENT BY DEVELOPER OR FRANCHISOR ........ 6
X. ORGANIZATION OF DEVELOPER ........ 8
XI. DEATH OR DISABILITY OF DEVELOPER ........ 9
XII. RESTRICTIVE COVENANTS ........ 9
XIII. FINANCIAL STATEMENTS OF DEVELOPER ........ 10
XIV. COMPLIANCE WITH APPLICABLE LAWS ........ 10
XV. INDEPENDENT CONTRACTOR AND INDEMNIFICATION ........ 11
XVI. GOVERNING LAW, VENUE, WAIVER OF JURY TRIAL AND WAIVER OF PUNITIVE DAMAGES ........ 11
XVII. APPROVALS AND NON-WAIVER ........ 13
XVIII. ENTIRE AGREEMENT ........ 13
XIX. NOTICES ........ 13
XX. ACKNOWLEDGMENTS ........ 14

**EXHIBIT A - DEVELOPMENT AREA**

**EXHIBIT B - DEVELOPMENT SCHEDULE**

**EXHIBIT C - FRANCHISE AGREEMENT**

**EXHIBIT D - GUARANTY**

# DEVELOPMENT AGREEMENT

THIS AGREEMENT is entered into on 9-9, 2016 by and between VAPORFI FRANCHISING, LLC, a Delaware limited liability company ("Franchisor") and MONICA HINTON WALTER HINTON ("Developer").

## INTRODUCTION

A. Franchisor has the right to establish, operate and to license others ("Franchisees") to operate businesses featuring e-cigarettes, vaporizers, e-liquids, and related items and accessories, and such other products and services as determined by Franchisor from time to time (the "VAPORFI System");

B. The VAPORFI System includes certain trade names, service marks, trademarks, logos, emblems, and indicia of origin, including the mark VAPORFI and other trade names, service marks and trademarks as are now, or in the future may be, designated by Franchisor for use in connection with the VAPORFI System (the "Proprietary Marks"), quality products and services, distinctive design, decor, color scheme and interior layouts, specifications for furniture and fixtures and décor items, operating procedures, and business practices and policies;

C. Franchisor controls the use of the Proprietary Marks, so that the public will recognize the VAPORFI System as the source of services and products having high standards of quality, appearance and service; and

D. Developer wishes to obtain the right to develop and operate businesses ("Shops") using the VAPORFI System, within the area specified on Exhibit A to this Agreement (the "Development Area").

**NOW, THEREFORE,** the parties, in consideration of the undertakings and commitments set forth in this Agreement, agree as follows;

## I. DEFINITIONS

A. Development Area: "Development Area" means the geographic area described in Exhibit A attached to this Agreement.

B. Franchise Agreement: "Franchise Agreement" means the then-current form of agreement (including all exhibits, riders and instruments used in connection with such agreement) used by Franchisor to grant franchises to own and operate Shops in the state or states where the Development Area is located. A copy of the current form of Franchise Agreement is attached to this Agreement as Exhibit C.

C. Development Schedule: "Development Schedule" means the number of Shops to be opened and operated by Developer and the time frame for doing so, as set forth on Exhibit C to this Agreement.

D. Shop: "Shop" means the VAPORFI business to be operated by Franchisees.

## II. GRANT AND ACCEPTANCE

A. Provided Developer fully complies with this Agreement, including, without limitation, the Development Schedule, and with each Franchise Agreement between Franchisor and Developer, Franchisor grants the exclusive right, and Developer undertakes the obligation, to develop and operate Shops only in the Development Area, under the terms and conditions of this Agreement. The Shops shall be located only at sites approved by Franchisor in writing.

B. The Shops must be developed and opened in accordance with the Development Schedule. Developer must open a minimum of one (1) new Shop in each Development Period (as specified in Exhibit "B"), even if Developer has satisfied the cumulative Shop opening requirements.

C. If, in any Development Period, Developer fails to meet the development obligations set forth in the Development Schedule, Franchisor shall have the right to terminate this Agreement. Franchisor, by written notice, may, but shall not be obligated to, reduce Developer's development obligations for any period, but such reduction shall not constitute a waiver of Developer's obligations for any subsequent period(s).

D. Developer may only exercise the development rights under this Agreement by executing a Franchise Agreement for each Shop to be developed by Developer. Developer agrees that any such Franchise Agreement may differ in form, but not as to initial franchise fees or royalties, from the Franchise Agreement set out in Exhibit "C" attached hereto.

E. Developer agrees that this Agreement does not grant Developer the right to use any of the Proprietary Marks or the VAPORFI System and that such rights can only be granted under a Franchise Agreement. Developer acknowledges that Developer has no right to sub-franchise or license others to use the Proprietary Marks or the VAPORFI System.

F. Franchisor reserves the right, without limitation to: (i) own and operate and/or grant to others the right to own and operate Shops at locations outside the Development Area on terms and conditions that Franchisor deems appropriate; (ii) sell proprietary products to Franchisees, to wholesale and retail businesses and through other distribution channels inside or outside the Development Area; and (iii) to own, acquire, establish and/or operate, and license others to establish and operate, businesses under other proprietary marks and other systems, whether such businesses are the same, similar, or different from those operating under the VAPORFI System, at any location within or outside the Development Area.

## III. TERM

The initial term of this Agreement shall commence on the date this Agreement is signed by the last party to do so and shall expire on the last day of the Development Schedule, unless sooner terminated in accordance with the provisions of this Agreement (the "Initial Term"). There are no renewal rights.

## IV. DEVELOPMENT FEE

A. In consideration of the exclusive development rights granted in this Agreement,

Developer agrees to pay Franchisor a non-refundable fee (the "Development Fee"), in an amount equal to the initial fee for the first Shop to be developed hereunder, Twenty-Nine Thousand Nine Hundred Dollars ($29,900) plus Fourteen Thousand Nine Hundred Fifty Dollars ($14,950), times the number of Shops after the first Shop to be opened pursuant to the Development Schedule, or a total of 104,700 ONE HUNDRED AND FOUR THOUSAND SEVEN HUNDRED Dollars ($104,700). The Development Fee shall be fully earned by Franchisor upon execution of this Agreement and shall be non-refundable under any circumstances.

B. The initial franchise fee for each Franchise Agreement executed by Developer and Franchisor during the Term shall be Twenty-Nine Thousand Nine Hundred Dollars ($29,900). Excluding the first Shop, Fourteen Thousand Nine Hundred Fifty Dollars ($14,950) from the Development Fee, shall be credited towards the Franchise Fee for each Shop opened by Developer in the Development Area during the Term and Developer shall only be required to pay the balance of the Franchise Fee, Fourteen Thousand Nine Hundred Fifty Dollars ($14,950) at the time of execution of each Franchise Agreement.

C. No Development Fee is due for Shops developed during the Term in excess of the total cumulative number of Shops required to be in operation at the expiration of this Agreement. However, the then current initial franchise fee is due at the time of execution of a Franchise Agreement for each such additional Shop.

## V. <u>DEVELOPMENT PROCEDURES</u>

A. Developer, at Developer's sole expense, shall:

1. Locate and obtain a site for each Shop to be developed pursuant to this Agreement.

2. Submit a site package for each proposed site. The site package shall contain such data as may be reasonably be required by Franchisor to evaluate the site and shall include a pro forma statement and capitalization plan for the proposed Shop. Franchisor shall notify Developer within forty-five (45) business days after receipt of the site package whether the proposed site is approved or disapproved. Site approval or disapproval shall be at the sole discretion of Franchisor and shall be in writing, signed by an officer of Franchisor. Franchisor's approval of a site is not a warranty, guaranty or representation that the site will be successful. Developer is cautioned not to make any binding commitments for a site until receiving Franchisor's written approval. Promptly after approval of any site, Franchisor shall transmit to Developer, a FDD and two (2) execution copies of the then current Franchise Agreement pertaining to the approved site, the terms of which may differ from those in Exhibit "C" hereto, except for the initial franchise fee, royalty and advertising expenditures. Immediately upon receipt of the FDD, Developer shall return to Franchisor a signed copy of the Acknowledgement of Receipt for the FDD. After the passage of the applicable disclosure period, Developer shall execute and deliver to Franchisor, the two (2) copies of the Franchise Agreement, the initial franchise fee required pursuant to the Franchise Agreement, less the credit, if any, applicable pursuant to Section IV. Franchisor shall promptly, upon receipt of the documents and initial franchise fee, execute and return to Developer one (1) copy of the Franchise Agreement. Developer shall then procure the site by purchase or lease and commence construction and operation of the Shop pursuant to the terms of the Franchise Agreement. Notwithstanding the

foregoing, if Franchisor is not able to deliver a FDD to Developer by reason of any lapse or expiration of its franchise registration, or because Franchisor is in the process of amending any such registration, or for any reason beyond Franchisor's reasonable control, Franchisor may delay approval of the site for Developer's proposed Shop until such time as Franchisor is able to deliver a FDD. If Developer fails to execute and return the Franchise Agreement with the respective payment as set forth above, Franchisor shall have the right to revoke its offer to grant to Developer a franchise to operate a Shop at the proposed location and to withdraw its approval of the proposed location.

3. If the site is leased, furnish Franchisor with a fully executed copy of the lease or sub-lease within the time frame set out in the Franchise Agreement.

4. If a Shop is damaged by a casualty, Developer shall repair the Shop so that it reopens within six (6) months of the casualty. Should Developer fail to reopen the Shop within six (6) months, that Shop shall not be included in determining compliance with the Development Schedule, which may be cause for Franchisor to terminate this Agreement and the Franchise Agreement for that Shop.

B. It shall be a condition precedent to Franchisor's obligations pursuant to Section V.A., that Developer shall have performed all of Developer's obligations under and pursuant to all agreements between Developer and Franchisor.

C. Regardless of any provisions in any Franchise Agreement executed pursuant to this Agreement, after commencement of operations of the first Shop opened pursuant to this Agreement, Franchisor shall have no obligation to provide initial training to Developer.

## VI. FORCE MAJEURE

Developer may, only in the event of fire, flood, civil unrest, strike, transportation shortages, inadequate supply of labor, material or energy or acts of God, war, riot, or any other similar event or cause beyond the control of Developer which directly affects compliance with the Development Schedule, declare a Force Majeure for the period of the delay up to a maximum of four (4) months. Such declaration by Developer shall have the effect of extending the annual deadlines as shown in Exhibit B.

## VII. DEFAULT AND TERMINATION

Franchisor may, at its option, and without waiving its rights hereunder or any other rights available at law or equity, including its right to damages, terminate this Agreement and all of the Developer's rights hereunder consistent with A. and B. below, as follows:

A. Without notice or opportunity to cure (unless otherwise stated below):

1. Developer abandons the development relationship without the prior consent of Franchisor at any time during the term of this Agreement.

2. Developer fails to develop and operate the minimum number of Shops as shown in Exhibit B, unless Developer pays to Franchisor, as liquidated damages and not as a

penalty, by the 30th day after the date Developer failed to satisfy the Development Schedule, an amount equal to the initial franchise fee(s) which would have been paid had the Shop(s) necessary to satisfy the Development Schedule been opened, plus a monthly royalty as to each Shop, of Five Hundred Dollars ($500) on or before the first day of each month commencing with the second month after the date Developer failed to satisfy the Development Schedule and continuing while the Development Schedule remains unsatisfied. If Developer fails to timely make any liquidated damage payment or fails to satisfy the Development Schedule in any two (2) consecutive Development Periods, Franchisor may terminate this Agreement. This clause will not be in effect if Developer has a Shop under development with an expected open date within ninety (90) days of date given in Exhibit B.

3. Developer files a petition in bankruptcy, or any similar petition seeking relief from debts under a similar state or federal code, or if a third party files an involuntary petition of bankruptcy against Developer and the action is not dismissed within sixty (60) days of filing.

4. Developer admits in writing an inability to pay debts as they come due, or makes an assignment for the benefit of creditors, or for the appointment of a receiver (permanent or temporary) for any part of its property.

5. A final judgment remains unsatisfied for a period of thirty (30) days, or a levy of execution is granted against the development rights granted by this Agreement or any Shop developed pursuant to this Agreement, or if the judgment is not discharged within five (5) days of a levy. If Developer has begun to take the corrective action within the respective period, then Developer shall have a reasonable period of time to complete such corrective action.

6. Conviction of Developer or the managing principal of Developer, if Developer is a business entity, of any crime punishable by imprisonment for more than one (1) year.

7. Developer's Franchise Agreement for any Shop is terminated because of a default by Developer.

8. A sale, other assignment or transfer in violation of section IX of this Agreement occurs.

9. The submission of materially false or misleading information to Franchisor by Developer, or the withholding of information which Developer is required to furnish.

10. A breach of this Agreement, though subsequently cured, more than three (3) times in a twenty-four (24) month period.

B. With notice and the following opportunity to cure:

1. Thirty (30) days, if the Developer fails to comply with any provision of this Agreement not mentioned above.

## VIII. POST TERMINATION OBLIGATIONS OF DEVELOPER

A. Upon termination of this Agreement becoming effective for any reason, or upon expiration of the term hereof, Developer agrees as follows:

1. To cease immediately any attempts to select sites on which to establish Shops.

2. To cease immediately to hold itself out in any way as an Developer of Franchisor or to do anything which would indicate a relationship between it, and Franchisor.

B. Termination of this Agreement shall not affect the rights of Developer to operate Shops in accordance with the terms of any Franchise Agreement(s) with Franchisor, executed prior to the termination of this Agreement, until and unless such Franchise Agreement, or any of them, are terminated in accordance with their terms, renewed or expired.

C. No right or remedy herein conferred upon or reserved to Franchisor is exclusive of any other right or remedy provided or permitted by law or in equity.

## IX. ASSIGNMENT BY DEVELOPER OR FRANCHISOR

A. Developer understands and acknowledges that the development rights have been granted by Franchisor in reliance on the business skill, financial capacity and personal character of Developer or Developer's owners, if Developer is a business entity. Accordingly, Developer shall not sell, assign, transfer, convey or give away this Agreement or any interest arising under this Agreement without the prior written consent of Franchisor, which shall not be unreasonably withheld, and any assignment or transfer which does not comply with the provisions of this Agreement shall be null and void, and shall constitute a material breach of this Agreement, for which Franchisor may immediately terminate this Agreement upon notice to Developer, and without any opportunity to cure. Notwithstanding the foregoing, until Developer has opened sixty percent (60%) of the Shops as specified in Exhibit "B", Developer may not assign, transfer, sell, convey or give away this Agreement or any interest arising under this Agreement.

B. A sale, assignment, gift, conveyance or transfer (all a "transfer") shall include the following events:

1. an assignment of this Agreement or any of the development rights granted under this Agreement;

2. transfer of ownership in Developer, if Developer is a business entity;

3. transfer of an interest in Developer, this Agreement or any Franchise Agreement entered into pursuant to this Agreement in a divorce, insolvency, business entity dissolution proceeding or otherwise by operation of law;

4. merger or consolidation or issuance of additional securities representing an ownership interest in Developer (or convertible into an ownership interest); or

5. transfer of an interest in Developer, this Agreement or any Franchise Agreement entered into pursuant to this Agreement in the event of the death of Developer or an owner of Developer by will, declaration of transfer in trust or under the laws of intestate succession.

C. Developer, if an individual, may, with the written approval of Franchisor, assign this Agreement to a single purpose business entity organized for the sole purpose of operating Shop, and in which only Developer has an ownership interest. Developer agrees not to use any name confusingly similar to the Proprietary Marks as the entity's name. Developer may not pledge this Agreement as collateral or otherwise encumber this Agreement.

D. Developer shall notify Franchisor at least thirty (30) days prior to the date any proposed transfer is to take place, and shall provide such information and documentation as Franchisor may reasonably request. Developer agrees that any such transfer is subject to the right of first refusal of Franchisor as described in Section G.

E. So long as Developer is in full compliance with this Development Agreement, and should Franchisor not elect to exercise its right of refusal as provided in Section G, Franchisor shall not unreasonably withhold its approval of an assignment or transfer to proposed assignees or transferees if:

1. Developer has complied with the requirements of Section IX.D.;

2. all obligations owed to Franchisor by Developer are fully paid and satisfied;

3. Developer (and any transferring owners, if Developer is a business entity) has executed a general release, in a form the same as or similar to the General Release attached to the Initial Franchise Agreement, of any and all claims against Franchisor, including its equity owners, officers, directors and employees, in their corporate and individual capacities including, without limitation, claims arising under federal, state or local laws, rules or ordinances, and any other matters incident to the termination of this Development Agreement or to the transfer of Developer's interest herein or to the transfer of Developer's ownership of all or any part of the Development Rights; provided, however, that if a general release is prohibited, Developer shall give the maximum release allowed by law;

4. the prospective transferee has satisfied Franchisor that it meets Franchisor's management, business and financial standards, and otherwise possesses the character and capabilities, including business reputation and credit rating, as Franchisor may require to demonstrate its ability to carry out the obligations contained herein and in the Franchise Agreement;

5. Developer has provided Franchisor with a complete copy of all contracts and agreements and related documentation between Developer and the prospective transferee relating to the intended sale or transfer of the Development Rights;

6. Developer, or the transferee, has paid to Franchisor a transfer fee in the amount of the greater of ten percent (10%) of the price set out in the offer described in Section

IX.D. or Five THOUSAND DOLLARS ($5,000.00); and

7. the transferee, or all owners of the transferee, has agreed to be personally bound jointly and severally by all provisions of this Development Agreement for the remainder of its term;

F. This Agreement and all rights herein, may be freely assigned and transferred by Franchisor, and shall be binding upon Franchisor's successors and assigns.

G. Developer agrees that, in the event of a sale or transfer of Developer's interest (except to a single purpose business entity as provided for in Section XII.C of this Agreement) that Franchisor shall have the option to purchase such interest, on the same terms and conditions offered by a third party. Franchisor shall advise Developer of its decision to exercise this Right of First Refusal within forty-five (45) days after receipt by Franchisor of all information requested by Franchisor to evaluate the third party offer. Developer agrees to accept an independent appraiser's determination as to value in the event of a non-cash offer from a third party. Developer further agrees and understands that any change in the terms offered by a third party after Franchisor has elected not to exercise this option, or if the sale is not completed within one hundred twenty (120) days after Franchisor was advised of the offer, shall constitute a new offer which must be submitted to Franchisor as in the case of the third party's initial offer. If Franchisor does not exercise its Right of First Refusal, Franchise may complete the sale to the third party who made the offer on the exact terms of the offer, subject to Franchisor's approval of the transfer in accordance with Section XII.A.

## X. ORGANIZATION OF DEVELOPER

A. Developer agrees to comply with the following terms and conditions if an assignment of this Agreement to a business entity is approved by Franchisor under the terms of Section IX.C:

1. The organizational documents shall provide that its activities are confined to the operation and development of VAPORFI Shops.

2. Developer shall maintain stop transfer instructions against the transfer on its records without Franchisor's written consent, and each document evidencing an ownership interest shall display a legend indicating that the "Transfer of ownership is subject to the terms and conditions of a Development Agreement with VAPORFI FRANCHISING, LLC".

3. Developer shall furnish to Franchisor copies of its organizational and governing documents.

4. If Developer is a corporation or limited liability company ("Entity"), all of Developer's owners shall sign the Guaranty and Assumption of Obligations attached as Exhibit "D".

## XI. DEATH OR DISABILITY OF DEVELOPER

Upon the death or mental incapacity of any person with an interest of more than fifty percent (50%) in this Agreement or in Developer, the executor, administrator or personal representative of such person shall transfer his interest to a third party approved by Franchisor within twelve (12) months. Such transfers, including, without limitation, transfers by devise or inheritance, shall be subject to the same conditions as any inter vivos transfer. However, in the case of transfer by devise or inheritance, if the heirs or beneficiaries of any such person are unable to meet the conditions stated in Section IX.E. hereof, the personal representative of the deceased shall have a reasonable time, not to exceed twelve (12) months from the date said personal representative is appointed, to dispose of the deceased's interest in Developer or in this Agreement, which disposition shall be subject to all the terms and conditions for transfers contained in this Agreement. It is understood and agreed, however, that notwithstanding the foregoing, the Development Schedule shall be complied with as though no such death or mental incapacity had occurred. In the event the interest described above is not disposed of within such time, Franchisor shall have the right to terminate this Agreement, upon thirty (30) days' notice to Developer's representative, or Franchisor shall have the right to re-purchase same at the same price being sought by the Developer's representative.

## XII. RESTRICTIVE COVENANTS

A. Developer covenants that, except as otherwise approved in writing by Franchisor, Developer shall not during this Initial Term and for a continuous uninterrupted period commencing upon the expiration or termination of this Agreement, regardless of the cause for termination, or upon the transfer of Developer's interest in this Agreement, and continuing for two (2) years, thereafter, as a proprietor, partner, investor, lender, shareholder, director, officer, member, manager, employee, principal, agent, representative, advisor, franchisor, franchisee, consultant or otherwise, either directly or indirectly, or in conjunction with any person, persons or legal entity(ies), have any interest in any business, offering the same or similar products and/or services to those offered under the VAPORFI System, in the Development Area, within ten (10) miles of the outer boundaries of the Development Area, or twenty (20) miles of any Shop open or under construction on the date this Agreement expires or terminates or Developer's interest in this Agreement is transferred.

Developer further covenants and agrees:

1. Not to divert or attempt to divert any present or prospective business or customer to any competitor by any direct or indirect means, or do or perform any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks and the VAPORFI System.

2. Not to employ or seek to employ any person who is at that time employed by Franchisor or a developer or franchisee of Franchisor, or otherwise directly or indirectly induce the employee to leave his or her employment, unless such employment is accomplished with the written consent of the person's employer.

3. Not to assist, or provide any other services or advice to any other business involving the same or similar products and/or services available under the VAPORFI System.

4. That any violation of the terms of this section will result in irreparable injury to Franchisor and Developer consents to the issuance of an injunction prohibiting any such conduct by Developer, which would violate the terms of this Section XV.

5. To furnish to Franchisor as a third party beneficiary, executed covenants, in a form prescribed by Franchisor, from those associated with Developer who may receive confidential material from or training by, Franchisor.

6. To pay all costs and expenses of Franchisor in enforcing this section XV, including, but not limited to, reasonable attorneys' fees at all trial and appellate levels.

## XIII. FINANCIAL STATEMENTS OF DEVELOPER

Developer agrees to furnish to Franchisor, within sixty (60) days of the close of Developer's fiscal year, a balance sheet and statement of profit and loss, prepared in accordance with generally accepted accounting principles consistently applied, which have been reviewed by a Certified Public Accountant.

## XIV. COMPLIANCE WITH APPLICABLE LAWS

A. Developer shall operate the Shop in strict compliance with all applicable laws, rules, and regulations of duly constituted governmental authorities, including, without limitation, obtaining and maintaining all required permits and licenses and payment of all taxes, and in strict compliance with the standard procedures established by Franchisor from time to time including, without limitation, accounting records and information, on such forms as Franchisor may require; payment procedures; hours of operation; standards of sanitation, maintenance, and repair; cleaning and fire prevention service; and all matters that, in Franchisor's judgment, require standardization and uniformity in all Shop. All costs that may be incurred in order to maintain and implement such standard procedures shall borne by Developer, at Developer's sole expense. Developer shall also provide to Franchisor, upon request, copies of all reports filed by Developer with any federal, state or local governmental agencies.

B. Developer and its owners agree to comply, and to assist Franchisor, to the fullest extent possible, in Franchisor's efforts to comply with Anti-Terrorism Laws (defined below). In connection therewith, Developer and its owners certify, represent, and warrant that none of their property or interests is subject to being blocked under, and that Developer and its owners otherwise are not in violation of, any of the Anti-Terrorism Laws. "Anti-Terrorism Laws" means Executive Order 13224, issued by the President of the United States, the USA PATRIOT Act, the U.S. Bank Secrecy Act, 31, U.S.C. Sec. 5318 et seq., the Regulations promulgated by the U.S. Treasury, Office of Foreign Asset Control, the Florida Money Transmitters Code, Ch. 560 F.S. and the Regulations promulgated thereunder, at 3C-560, Fl. Admin. Code and all other present and future federal, state, and local laws, ordinances, regulations, policies, lists, and other requirements of any governmental authority addressing or in any way relating to terrorist acts and acts of war. Any violation of the Anti-Terrorism Laws by Developer or its owners, or any blocking of Developer's or its owners' assets under the Anti-Terrorism Laws, shall constitute good cause for immediate termination of this Agreement.

## XV. INDEPENDENT CONTRACTOR AND INDEMNIFICATION

A. It is understood and agreed by the parties that this Agreement does not create a fiduciary relationship between them; that Developer is an independent contractor; and, that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, employer, joint employer, enterprise or servant of the other for any purpose whatsoever. Developer agrees not to act nor represent himself, directly or indirectly as an agent of Franchisor.

B. Developer agrees to indemnify and hold Franchisor harmless from any liability, damage, or cost (including reasonable attorney's fees) as a result of any claims, judgments, demands, or costs of any nature arising out of or otherwise connected in any way with this Agreement or the development and operation of Shops.

## XVI. GOVERNING LAW, VENUE, WAIVER OF JURY TRIAL AND WAIVER OF PUNITIVE DAMAGES

A. This Agreement takes effect upon its acceptance and execution by Franchisor in Miami-Dade County, Florida, and shall be interpreted and construed under the laws of the State of Florida, which laws shall prevail in the event of any conflict of laws.

B. Developer and Franchisor agree that United States District Court for the Southern District of Florida and the courts of the 11th Judicial Circuit of the State of Florida in and for Miami-Dade County, Florida shall be the only proper and exclusive venue and forum for adjudicating any dispute under or in connection with this Agreement, not subject to arbitration as provided for hereinafter. The parties agree not to challenge the jurisdiction or venue of these courts.

C. Dispute Resolution.

7) The Federal Arbitration Act will govern all questions about the enforceability and scope of Subsection XVI.C.2. and no arbitration issues will be resolved under any state statutes, regulations or common law.

8) The parties hereby agree to submit any claim or dispute, disagreement, or matter pertaining to interpretation of this Agreement, this Agreement, the breach thereof, the relationship between Franchisor and Developer or any other issue or dispute under this Agreement (the "Dispute"), except as otherwise specified in this Section XVI, to binding arbitration before the American Arbitration Association in Miami, Florida. The hearing shall be conducted in accordance with rules governing commercial disputes as promulgated by the American Arbitration Association. There shall be one (1) neutral arbitrator chosen from a list maintained by the American Arbitration Association. The individual shall be experienced in the operation of franchise systems either as attorney, accountant or businessperson. Unless prohibited by applicable law, any Dispute must be brought by filing a written demand for arbitration within one (1) year following the conduct, act or other event or occurrence first giving rise to the claim; otherwise, the right to any remedy shall be deemed forever waived and lost. The arbitrator shall render a binding and legally enforceable award that may be confirmed by a court of competent jurisdiction upon application of the prevailing party. Each party shall initially

bear its own attorneys' fees and other costs of the arbitration plus 50% of the cost of any arbitration fees or costs. The arbitrator, however, shall in his/her discretion have the authority to award to the prevailing party all costs of the proceeding, including the arbitrator's costs, out-of-pocket disbursements and reasonable attorneys' fees. The arbitrator will not have the authority to: (a) award exemplary or punitive damages; (b) stay the effectiveness of any pending termination of this Agreement; or (c) render any award that modifies or suspends any lawful provision of this Agreement.

9) Any Dispute and any arbitration will be conducted and resolved on an individual basis only and not a class-wide, multiple plaintiff or similar basis. Any such arbitration proceeding will not be consolidated with any other arbitration proceeding involving any other person, except for disputes involving affiliates of the parties to such arbitration. The parties agree that, in connection with any such arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by the Federal Rules of Civil Procedure) within the same proceeding as the Dispute to which it relates. Any such Dispute which is not submitted or filed in such proceeding will be barred. Any arbitration award will have a binding effect only on the actual Dispute arbitrated, and will not have any collateral effect on any other Dispute whatsoever, whether in litigation, arbitration, mediation, or other dispute resolution proceeding.

D. Should either party commence any action or proceeding for the purpose of enforcing, or preventing the breach of, any provision hereof, whether by arbitration, judicial or quasi-judicial action or otherwise, or for damages for any alleged breach of any provision hereof, or for a declaration of such party's rights or obligations hereunder, then the prevailing party shall be reimbursed by the losing party for all costs and expenses incurred in connection therewith, including, but not limited to, reasonable attorneys' fees for the services rendered to such prevailing party at all trial and appellate levels. All sums, which are due but unpaid, shall bear interest from the date due at the highest rate permissible by applicable law.

E. **Franchisor and Developer knowingly, voluntarily and intentionally waive the right either may have to a trial by jury in any litigation based on this Agreement, or arising out of, under or in connection with this Agreement, any Franchise Agreement entered into in connection with a Shop developed pursuant to this Agreement, or any course of conduct, course of dealing, statements (whether oral or written) or actions of either party.**

F. **Franchisor and Developer waive to the fullest extent permitted by law any right to or claim for any punitive or exemplary damages against the other and agree that, in the event of a dispute between them, each shall be limited to the recovery of the actual damages sustained.**

G. **The provisions of this section are a material inducement for Franchisor granting the development rights to Developer. Developer certifies that no representative or agent of Franchisor has represented, expressly or otherwise, that Franchisor would not, in the event of litigation, seek to enforce the waiver of trial by jury provision or the waiver of punitive damages provision.**

H. No right or remedy conferred upon or reserved to Franchisor or Developer by this Agreement is intended to be, nor shall it be deemed, exclusive of any other right or remedy under

this Agreement or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

I. Nothing herein contained shall bar Franchisor's right to obtain injunctive relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions, except any requirement for the posting of a bond, which requirement, if any, is expressly waived by Developer.

## XVII. APPROVALS AND NON-WAIVER

A. Whenever this Agreement requires the prior approval or consent of Franchisor, Developer shall make a timely written request in writing to Franchisor, and such approval or consent must be in writing.

B. No failure of Franchisor to exercise any right reserved to it in this Agreement, or to insist upon compliance by Developer with any obligation or condition in this Agreement, and no custom or practice of the parties at variance with the terms of this Agreement shall constitute a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement. No delay or failure of Franchisor to exercise any right under this Agreement shall constitute a waiver of Franchisor's right to enforce and demand strict compliance within the terms of this Agreement. Waiver by Franchisor of any particular default shall not affect or impair Franchisor's right with respect to any subsequent default of the same or of a different provision.

C. Franchisor makes no warranties or guarantees upon which Developer may rely, and assumes no liability or obligation to Developer or any third party to whom Franchisor would not be otherwise liable by providing any waiver, approval, consent or suggestion or by reason of any neglect, delay or denial of a request.

## XVIII. ENTIRE AGREEMENT

This Agreement and the documents referred to in this Agreement, together with Developer's Application, financial statement and capitalization plan submitted by Developer upon which Franchisor is relying in granting development rights to Developer, constitute the entire agreement of the parties, and supersede all prior negotiations, commitments, representations and agreements with respect to the subject matter of this Agreement. However, nothing in this or in any related agreement, is intended to disclaim the representations Franchisor has made in the Franchise Disclosure Document furnished to you by the Franchisor.

## XIX. NOTICES

All notices, demands, requests for consent or approval under this Agreement shall be in writing and shall be delivered by any means providing a receipt for delivery to the parties at the following addresses unless and until a different address has been designated by written notice to the other party:

**Notices to Franchisor:**

VAPORFI FRANCHISING, LLC
14300 Commerce Way
Miami Lakes, Florida 33016

**Notices to Developer:**

WALTER HINTON
MONICA HINTON
4221 CLUB DR. NE
Atlanta, GA 30319

## XX. ACKNOWLEDGMENTS

Developer hereby acknowledges the following:

(a) DEVELOPER HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF THE BUSINESS CONTEMPLATED BY THIS AGREEMENT AND UNDERSTANDS AND ACKNOWLEDGES THAT THE BUSINESS CONTEMPLATED BY THIS AGREEMENT INVOLVES BUSINESS RISKS MAKING THE SUCCESS OF THE VENTURE LARGELY DEPENDENT UPON THE BUSINESS ABILITIES AND PARTICIPATION OF DEVELOPER AND ITS EFFORTS AS AN INDEPENDENT BUSINESS OPERATOR.

(b) DEVELOPER HAS NO KNOWLEDGE OF ANY REPRESENTATIONS BY FRANCHISOR OR ITS OFFICERS, MEMBERS, EMPLOYEES, AGENTS OR SERVANTS, ABOUT THE BUSINESS CONTEMPLATED BY THIS AGREEMENT THAT ARE CONTRARY TO THE TERMS OF THIS AGREEMENT OR THE DOCUMENTS INCORPORATED HEREIN. DEVELOPER REPRESENTS, AS AN INDUCEMENT TO FRANCHISOR'S ENTRY INTO THIS AGREEMENT, THAT IT HAS MADE NO MISREPRESENTATIONS IN OBTAINING THIS AGREEMENT.

(c) DEVELOPER ACKNOWLEDGES THAT FRANCHISOR OR ITS AGENT HAS PROVIDED DEVELOPER WITH A FRANCHISE DISCLOSURE DOCUMENT NOT LATER THAN THE EARLIER OF FOURTEEN (14) DAYS BEFORE THE EXECUTION OF THIS AGREEMENT, OR FOURTEEN (14) DAYS BEFORE ANY PAYMENT OF ANY CONSIDERATION. DEVELOPER FURTHER ACKNOWLEDGES THAT DEVELOPER HAS READ SUCH FRANCHISE DISCLOSURE DOCUMENT AND UNDERSTANDS ITS CONTENTS.

(d) DEVELOPER ACKNOWLEDGES THAT IT HAS HAD AMPLE OPPORTUNITY TO CONSULT WITH DEVELOPER'S OWN ATTORNEYS, ACCOUNTANTS AND OTHER ADVISORS AND THAT THE ATTORNEYS FOR FRANCHISOR HAVE NOT ADVISED OR REPRESENTED DEVELOPER WITH RESPECT TO THIS AGREEMENT OR THE RELATIONSHIP THEREBY CREATED.

(e) DEVELOPER, TOGETHER WITH DEVELOPER'S ADVISERS, HAS SUFFICIENT KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS TO MAKE AN INFORMED INVESTMENT DECISION WITH RESPECT TO THE DEVELOPMENT RIGHTS.

(f) DEVELOPER IS AWARE OF THE FACT THAT OTHER PRESENT OR FUTURE DEVELOPERS OF FRANCHISOR MAY OPERATE UNDER DIFFERENT FORMS OF AGREEMENT(S), AND CONSEQUENTLY THAT FRANCHISOR'S OBLIGATIONS AND RIGHTS WITH RESPECT TO ITS VARIOUS DEVELOPERS MAY DIFFER MATERIALLY IN CERTAIN CIRCUMSTANCES.

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement as of the date indicated on the first page.

**FRANCHISOR:**

VAPORFI FRANCHISING, LLC

By: ______________________________

**DEVELOPER:**

By: Monica Hinton

MONICA HINTON, OWNER

Walter Hinton

WALTER HINTON, OWNER

**EXHIBIT A**

TO THE VAPORFI DEVELOPMENT AGREEMENT

**DEVELOPMENT AREA**

The Development Area referred to in the Agreement shall be:

FULTON COUNTY
COBB COUNTY
DEKALB COUNTY
GLYNN COUNTY
CLARKE COUNTY

**EXHIBIT B**

TO THE VAPORFI DEVELOPMENT AGREEMENT

**DEVELOPMENT SCHEDULE**

| Development Period | Number of Shops To be opened | Cumulative Shops In operation |
|---|---|---|
| 10/1/16-2/1/17 | 1 | 1 |
| 3/1/17-5/1/17 | 2 | 3 |
| 6/1/17-9/1/17 | 3 | 6 |
| 10/1/17-12/1/17 | 1 | 7 |
| _/_/_-_/_/_ | | |
| _/_/_-_/_/_ | | |

# EXHIBIT C

TO THE VAPORFI DEVELOPMENT AGREEMENT

**FRANCHISE AGREEMENT**

Attached is the current form of Franchise Agreement used by Franchisor in granting franchises for VAPORFI Shops.

**EXHIBIT D**

TO THE VAPORFI DEVELOPMENT AGREEMENT

**GUARANTY AND ASSUMPTION OF OBLIGATIONS**

THIS GUARANTY AND ASSUMPTION OF OBLIGATIONS (this "Guaranty") is given this ____ day of _____________, 20___, by ____________________________.

In consideration, of and as an inducement to, either the execution or approval of the assignment of a certain Development Agreement of even date herewith (the "Agreement") by **VAPORFI FRANCHISING, LLC** (the "Franchisor"), each of the undersigned hereby personally and unconditionally (a) guarantees to the Franchisor, and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that MONICA HINTON WALTER HINTON ("Developer") shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement and (b) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement, both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities, including without limitation the provisions of Section XII.

Each of the undersigned consents and agrees that: (1) his or her liability under this Guaranty shall be joint and several; (2) he or she shall render any payment or performance required under the Agreement upon demand if Developer fails or refuses punctually to do so; (3) such liability shall not be contingent or conditioned upon pursuit by the Franchisor of any remedies against Franchisee or any other person; and (4) such liability shall not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which the Franchisor may from time to time grant to Developer to any other person, including without limitation the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this Guaranty, which shall be continuing and irrevocable during the term of the Agreement.

The undersigned further agree that in the event it becomes necessary for Franchisor to enforce the terms of this Guaranty against the undersigned, the undersigned shall be obligated for all of Franchisor's costs and expenses, so incurred, including Franchisor's attorney's fees, at all trial and appellate levels.

IN WITNESS WHEREOF, each of the undersigned has hereunto affixed his or her signature on the same day and year as the Agreement was executed.

| GUARANTOR(S) | PERCENTAGE OF OWNERSHIP OF DEVELOPER |
|---|---|
| MONICA HINTON | 50 % |
| WALTER HINTON | 50 % |
| | % |
| | % |

# Exhibit C

AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

# COMMERCIAL ARBITRATION RULES DEMAND FOR ARBITRATION

*For Consumer or Employment cases, please visit **www.adr.org** for appropriate forms.*

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

Name of Respondent: See attached Addendum, List of Respondent parties

Address:

| | | |
|---|---|---|
| City: | State: Select... | Zip Code: |
| Phone No.: | Fax No.: | |

Email Address:

Name of Representative (if known): Jan Gilbert, Esq.

Name of Firm (if applicable): JGilbert@Polsinelli.com

Representative's Address: 1401 I Street N.W., Suite 800

| | | |
|---|---|---|
| City: Washington | State: District of Columbia | Zip Code: 20005 |
| Phone No.: 202-777-8918 | Fax No.: 703-615-3957 | |

Email Address: jgilbert@polsinelli.com

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute:

1) Respondents fraudulently induced Claimants to invest in the Vaporfi franchise system, as franchisees, by purposeful failing to make proper Item 3 disclosures in their Franchise Disclosure Document, in violation of FTC Rule 436, Florida law and Georgia law; 2) Respondents breached the parties' franchise agreement in multiple ways and abused their discretion, in bad faith, in making detrimental changes to Vaporfi's business model; and, 3) Each of the named Respondents (including Turning Point Brands) is liable as an alter-ego of the franchisor.

Dollar Amount of Claim: $ $1,500,000.00

Other Relief Sought: ☑ Attorneys Fees ☑ Interest ☑ Arbitration Costs ☑ Punitive/Exemplary

☑ Other: Rescission of the parties' franchise agreement and recoupment of entire monetary investment as provided under FL and GA Law

Amount enclosed: $ 3,850.00

In accordance with Fee Schedule: ☑ Flexible Fee Schedule ☐ Standard Fee Schedule

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

- Familiarity with federal regulations pertaining to franchise industry disclosure requirements and state franchise statutes;
- Familiarity with commercial disputes; and,
- Familiary with franchise operations issues.

Hearing locale: Miami, Florida (SEE EXH. A, Relevant provisions of Franchise Agreement)

*(check one)* ☐ Requested by Claimant ☑ Locale provision included in the contract

Estimated time needed for hearings overall: hours or 2 days

***Please visit our website at www.adr.org if you would like to file this case online.***
***AAA Case Filing Services can be reached at 877-495-4185.***

AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

| | | |
|---|---|---|
| Type of Business:<br>Claimant: Franchisee | Respondent: Franchisor and owners of Franchisor | |
| Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other?<br>No. | | |
| Signature (may be signed by a representative): [signature] | Date:<br>November 21, 2019 | |
| Name of Claimant: Walter Hinton and Monica Hinton | | |
| Address (to be used in connection with this case): 4221 Club Drive NE | | |
| City: Atlanta | State: Georgia | Zip Code: 30319 |
| Phone No.: 978-618-0617 | Fax No.: | |
| Email Address: whinton16@att.net | | |
| Name of Representative: Louis D. Tambaro, Esq. | | |
| Name of Firm (if applicable): Jardim, Meisner & Susser, P.C. | | |
| Representative's Address: 30B Vreeland Road, Suite 100 | | |
| City: Florham Park | State: New Jersey | Zip Code: 07932 |
| Phone No.: 732-939-3195 | Fax No.: 973-835-7645 | |
| Email Address: louis@jmslawyers.com | | |
| To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ 08043. At the same time, send the original Demand to the Respondent. | | |

*Please visit our website at www.adr.org if you would like to file this case online.*
*AAA Case Filing Services can be reached at 877-495-4185.*

**ADDENDUM TO DEMAND FOR ARBITRATION**

**LIST OF NAMED RESPONDENTS**

| RESPONDENT PARTY | ADDRESS | Represented by: |
|---|---|---|
| Turning Point Brands, Inc. | 5201 Interchange Way<br>Louisville, Kentucky<br>40229 | Jan Gilbert, Esq.<br>Polsinelli<br>1401 I Street N.W., Suite 800<br>Washington, D.C. 20005<br>JGilbert@Polsinelli.com |
| International Vapor Group, LLC | 14300 Commerce Way,<br>Miami Lakes, FL 33016 | Jan Gilbert, Esq. (Polsinelli)<br>Polsinelli<br>1401 I Street N.W., Suite 800<br>Washington, D.C. 20005<br>JGilbert@Polsinelli.com |
| Vaporfi, Inc. | 14300 Commerce Way,<br>Miami Lakes, FL 33016 | Jan Gilbert, Esq.<br>Polsinelli<br>1401 I Street N.W., Suite 800<br>Washington, D.C. 20005<br>JGilbert@Polsinelli.com |
| Vaporfi Franchising, LLC | 14300 Commerce Way,<br>Miami Lakes, FL 33016 | Jan Gilbert, Esq.<br>Polsinelli<br>1401 I Street N.W., Suite 800<br>Washington, D.C. 20005<br>JGilbert@Polsinelli.com |

**EXHIBIT A**

**VAPORFI**
**FRANCHISE AGREEMENT**

THIS FRANCHISE AGREEMENT (the "Agreement") is made at Atlanta GA, ____________, as of the 9 day of September, 20 16 by and between **VAPORFI FRANCHISING, LLC**, a Delaware limited liability company (hereinafter called "Franchisor") and Monica Hinton & Walter Hinton (hereinafter, called "Franchisee").

**RECITALS**

Franchisee hereby acknowledges receipt of a **VAPORFI** Franchise Disclosure Document, including a copy of this Agreement, containing all of its material terms, which Franchisee received at the earlier of: 1) fourteen (14) days prior to the signing of this Franchise Agreement or any related agreement(s); or 2) fourteen (14) days before any payment by Franchisee to Franchisor.

This Agreement is concerned with the offer and sale of a franchise for the establishment and operation of a **VAPORFI** retail business (the "**Shop**") offering electronic cigarettes, e-liquids, nicotine; vaporizers and accessories and other related items, as presently designated by Franchisor and as may be improved, further developed, or otherwise modified by Franchisor from time to time.

The distinguishing characteristics of a **Shop** include, but are not limited to: the name "**VAPORFI**"; "know-how"; sales and merchandising methods; proprietary products; training; advertising techniques; signage; trade dress; architectural design; record keeping and business management methods, all of which may be changed from time to time by Franchisor (hereinafter collectively, the "System").

Franchisee is desirous of obtaining a franchise to operate a **Shop** utilizing the concepts, methods, and techniques all under the System, as such System may be constituted by Franchisor from time to time (the "Franchised Business"). Franchisee has submitted an application and other pertinent information, including financial statements, to Franchisor which fully and truthfully set forth the information therein and Franchisee has further advised Franchisor of all persons who will hold interests in the franchise.

Franchisee has read this Agreement and understands and accepts the terms, conditions, and covenants contained in this Agreement as being reasonably necessary to maintain Franchisor's standards of quality and service and the uniformity of those standards at all **Shops** in order to protect and preserve the Franchisor's trademarks and the goodwill associated therewith.

THEREFORE, Franchisor and Franchisee, intending to be legally bound, for and in consideration of the mutual covenants hereinafter following, do mutually covenant and agree:

## I. LICENSE, LICENSED MARKS, AND PROTECTED TERRITORY

A. License

Franchisor hereby grants Franchisee the right to use the service mark "**VAPORFI**" and

by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of the prohibition or unenforceability, without invalidating the remaining provisions of this Agreement. Any prohibition against or unenforceability of any provision of this Agreement in any jurisdiction, including the state whose law governs this Agreement, shall not invalidate the provision or render it unenforceable in any other jurisdiction. To the extent permitted by applicable law, Franchisee waives any provision of law which renders any provision of this Agreement prohibited or unenforceable in any respect.

L. Dispute Resolution.

1) The Federal Arbitration Act will govern all questions about the enforceability and scope of Subsection XXII.L.2) and no arbitration issues will be resolved under any state statutes, regulations or common law.

2) The parties hereby agree to submit any claim or dispute, disagreement, or matter pertaining to interpretation of this Agreement, or issues arising out of or relating to the offer and sale of the franchise, this Agreement, the breach thereof, the relationship between Franchisor and Franchisee or any other issue or dispute under this Agreement (the "Dispute"), except as otherwise specified in this Subsection or in Subsection XVII.A.1) above, to binding arbitration before the American Arbitration Association in Miami, Florida. The hearing shall be conducted in accordance with rules governing commercial disputes as promulgated by the American Arbitration Association. There shall be one (1) neutral arbitrator chosen from a list maintained by the American Arbitration Association. The individual shall be experienced in the operation of franchise systems either as attorney, accountant or businessperson. Unless prohibited by applicable law, any Dispute must be brought by filing a written demand for arbitration within one (1) year following the conduct, act or other event or occurrence first giving rise to the claim; otherwise, the right to any remedy shall be deemed forever waived and lost. The arbitrator shall render a binding and legally enforceable award that may be confirmed by a court of competent jurisdiction upon application of the prevailing party. Each party shall initially bear its own attorneys' fees and other costs of the arbitration plus 50% of the cost of any arbitration fees or costs. The arbitrator, however, shall in his/her discretion have the authority to award to the prevailing party all costs of the proceeding, including the arbitrator's costs, out-of-pocket disbursements and reasonable attorneys' fees. The arbitrator will not have the authority to: (a) award exemplary or punitive damages; (b) stay the effectiveness of any pending termination of this Agreement; or (c) render any award that modifies or suspends any lawful provision of this Agreement.

3) Any Dispute and any arbitration will be conducted and resolved on an individual basis only and not a class-wide, multiple plaintiff or similar basis. Any such arbitration proceeding will not be consolidated with any other arbitration proceeding involving any other person, except for disputes involving affiliates of the parties to such arbitration. The parties agree that, in connection with any such arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by the Federal Rules of Civil Procedure) within the same proceeding as the Dispute to which it relates. Any such Dispute which is not submitted or filed in such proceeding will be barred. Any arbitration award will have a binding effect only on the actual Dispute arbitrated, and will not have any collateral effect on any other Dispute whatsoever, whether in litigation, arbitration, mediation, or other dispute resolution proceeding.

4) Notwithstanding the foregoing, the infringement of the Proprietary Marks,

the System or copyrighted items, unauthorized disclosure of Confidential Information, violations of the confidentiality or non-competition covenants may cause irreparable harm to Franchisor, other **VAPORFI** franchisees and the System as a whole. Accordingly, claims by either party related to these acts shall not be subject to the arbitration procedure, including but not limited to, claims for liquidated or punitive damages arising from any such infringement, unauthorized disclosure, or violation of a non-solicitation or non-disclosure covenant.

5) In the event any legal proceedings between the parties arise under this Agreement, the prevailing party will be entitled to recover reasonable attorneys' fees and court costs from the other party, at all trial and appellate levels.

6) No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor will it be deemed, exclusive of any other right or remedy under this Agreement or by law or equity provided or permitted, but each will be cumulative of every other right or remedy.

M. Jurisdiction and Venue

Except as otherwise set forth above in Section XXII.L., pertaining to arbitration, each of the parties irrevocably and unconditionally: (a) agrees that any suit, action or legal proceeding arising out of or relating to this Agreement shall only be brought in the court(s) of record for the State and County or the United States District Court, whose jurisdiction encompasses the location of the principal office of the Franchisor; (b) consents to the jurisdiction of each such court in any suit, action or proceeding; (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts; and (d) agrees that service of any court paper may be effected on such party by mail, as provided in this Agreement, or in such other manner as may be provided under applicable laws or court rules of the State of Florida; provided, however, that Franchisor may obtain injunctive relief in any appropriate forum against the actual or threatened conduct that will cause loss or damage, under the usual equity rules.

N. JURY TRIAL WAIVER

FRANCHISOR AND FRANCHISEE IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THEM.

O. LIMITATION OF ACTIONS

ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND THE FRANCHISOR OR THE FRANCHISEE'S OPERATION OF THE FRANCHISE, BROUGHT BY FRANCHISEE, SHALL BE COMMENCED WITHIN EIGHTEEN (18) MONTHS FROM THE OCCURRENCE OF THE FACTS GIVING RISE TO ANY SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED.

P. WAIVER OF PUNITIVE DAMAGES

THE FRANCHISOR AND FRANCHISEE (AND ITS OWNERS AND GUARANTORS, IF APPLICABLE), HEREBY WAIVE TO THE FULLEST EXTENT

# Exhibit D

AMERICAN ARBITRATION ASSOCIATION

WALTER HINTON and
MONICA HINTON

Claimants

v.

TURNING POINT BRANDS, INC.;
INTERNATIONAL VAPOR GROUP, LLC;
VAPORFI, INC. and
VAPORFI FRANCHISING, LLC,

Respondents.

Claim No. 01-19-0004-1467

**ANSWERING STATEMENT**

---

Turning Point Brands, Inc., International Vapor Group, LLC, and VaporFi, Inc. (an inactive entity), hereby file their objection to jurisdiction and VaporFi Franchising, LLC ("Respondent") files its Answering Statement.

**OBJECTION TO JURISDICION**

Turning Point Brands, Inc., International Vapor Group, LLC, and VaporFi, Inc. (an inactive entity) object to jurisdiction of the arbitrator over them as they are not parties to the agreements at issue and in which the arbitration clauses invoked by Claimants are contained. Further, these parties are not alter egos of the Respondent, and Claimants cannot establish the necessary elements to prove an alter ego claim. To the extent Turning Point Brands, Inc., International Vapor Group, LLC, and VaporFi, Inc. were ever proper parties to this arbitration, they incorporate their Answering Statement.

**General Denial**

Respondent generally denies each and every material allegation, claim, and request for relief set forth in the Demand for Arbitration filed by Claimants Walter Hinton and Monica Hinton

(collectively, "Claimants").

**Affirmative Defenses**

Respondent asserts the following affirmative and additional defenses based on current knowledge and the limited factual allegations, which bar some or all of Claimants' claims and/or requests for relief:[1]

1. Claimants fail to state a claim upon which relief may be granted.

2. Claimants' claims are barred or limited by the contractual limitations period set forth in the Franchise Agreements.

3. Claimants' claims are barred or limited by applicable statutes of limitations.

4. Claimants' claims are barred in whole or in part by the doctrine of laches, waiver, ratification, estoppel, and/or acquiescence.

5. Claimants' claims are barred or limited by the terms of the franchise agreements and other agreements with Respondent.

6. Claimants' claims or requests for relief are barred or limited by the limitations on claims, damages, and relief set forth in the Franchise Agreements, including claims for "punitive/exemplary" damages.

7. Claimants' claims are barred by the doctrines of merger and integration.

8. Claimants' claims are barred or limited by the parol evidence rule.

9. Claimants' claims are barred or limited because of the acknowledgements and non-reliance clauses contained in the Franchise Agreements.

10. Claimants lack standing to assert the claims they have asserted in this action.

---

1 The assertion of these defenses is not a representation or concession as to which party bears the burden of proof, production, or persuasion on any issue.

11. Claimants' claims are barred or limited by lack of privity of contract.

12. Claimants' claims are barred or limited by Respondents' compliance with all of its disclosure obligations under applicable federal and/or state laws and regulations.

13. Claimants' claims are barred or limited by Claimants' lack of reasonable reliance upon purported statements or omissions allegedly made by Respondents.

14. Claimants' claims are barred or limited because Respondents acted in good faith in accordance with its legal rights and in a commercially reasonable manner in the exercise of its business judgment.

15. Claimants' claims are barred or limited because Claimants have suffered no damages as a result of any alleged wrongful conduct by Respondents.

16. Claimants' claims are barred or limited by their own breaches of the franchise agreements and development agreement, as amended, and other agreements.

17. Claimants' damages, if any, were the proximate result of their own actions, omissions, or breaches. Claimants' own actions, omissions, or breaches caused or contributed to their alleged losses.

18. Claimants' damages, if any, were the result of acts and/or omissions of one or more third parties.

19. Claimants' claims are barred or limited because Claimants failed to mitigate their damages, if any.

20. Claimants' claims are barred or limited by Claimants' unclean hands and/or lack of good faith.

21. Claimants' claims are barred or limited by the doctrine of set-off. Respondents' damages caused by Claimants' breaches of the franchise agreements and development agreement,

as amended, as well as their promissory note, guaranty, and guaranty and assumption of obligations, and Claimants' misconduct, exceed any damages that might be recoverable by Claimants from Respondents, if any.

22. Claimants' claims are barred by impossibility or impracticability of performance and/or mutual mistake.

Respondent reserves the right to assert additional defenses as may be warranted.

WHEREFORE, Respondent respectfully requests the arbitrator enter an order dismissing all of Claimants' claims with prejudice, awarding Respondent its reasonable costs and expenses (including attorneys' fees) incurred in defending this matter, and awarding Respondent any other relief the arbitrator deems appropriate.

**Counterclaims**

Respondents reserve their right to assert counterclaims against Claimants in accordance with AAA's Commercial Arbitration Rules.

Respectfully submitted this 11th day of December, 2019.

*s/ Leonard H. MacPhee*
Leonard H. MacPhee, Colorado Bar #27753
lmacphee@polsinelli.com
Polsinelli PC
1401 Lawrence Street, Suite 2300
Denver, CO 80202
Telephone: (303) 583-8270

Jan S. Gilbert, D.C. Bar #427920
jgilbert@polsinelli.com
Polsinelli PC
1401 I Street N.W., Suite 800
Washington, DC 20005
Telephone: (202) 777-8918

*Attorney for Turning Point Brands, Inc., International Vapor Group, LLC, VaporFi, Inc., and Respondent VaporFi Franchising, LLC*

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true and correct copy of the foregoing instrument has been emailed to Louis D. Tambaro, Esq., on December 11, 2019.

*s/ Leonard H. MacPhee*
Leonard H. MacPhee

# Exhibit E

AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

Rebecca Storrow
Vice President
Miami Tower, 100 SE 2nd Street, Suite 2300
Miami, FL 33131
Telephone: (305)358-7777
Fax: (305)358-4931

February 19, 2020

Louis D. Tambaro, Esq.
Jardim, Meisner & Susser, P.C.
30B Vreeland Road
Suite 100
Florham Park, NJ 07932
Via Email to: louis@jmslawyers.com

Jan Gilbert, Esq.
Polsinelli PC
1401 I Street, NW
Suite 800
Washington, DC 20005
Via Email to: jgilbert@polsinelli.com

Case Number: 01-19-0004-1467

Walter Hinton and Monica Hinton
-vs-
Turning Point Brands, Inc.,
International Vapor Group, LLC,
Vaporfi, Inc. and Vaporfi Franchising, LLC

Dear Parties:

This will confirm that the above referenced matter is being closed as withdrawn by the Claimant as of the date of this letter.

Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain electronic case documents in our electronic records system. Such electronic documents may not constitute a complete case file. Other than certain types of electronic case documents that the AAA maintains indefinitely, electronic case documents will be destroyed 18 months after the date of this letter.

We appreciate the opportunity to assist you in resolving your dispute. As always, please do not hesitate to contact me if you have any questions.

Sincerely,

Angela Romero Valedon
Director of ADR Services
Direct Dial: (786)406-6642
Email: AngelaValedon@adr.org

cc:
Walter Hinton

Terri Hardwick